Akil AL–JUNDI, a/k/a Herbert Scott Deane; Big Black, a/k/a Frank Smith; Elizabeth Durham, Mother and Legal Representative of Allen Durham, deceased; Litho Lundy, Mother and Legal Representative of Charles Lundy, deceased; Theresa Hicks, Widow and Legal Representative of Thomas Hicks, deceased; Alice McNeil, Mother and Legal Representative of Lorenzo McNeil, deceased; Maria Santos, Mother and Legal Representative of Santiago Santos, deceased; Jomo Sekou Omowali, a/k/a Eric Thompson; Vernon LaFranque; Alfred Plummer; Herbert X. Blyden; Joseph Little; Robin Palmer; George "Che" Nieves; James B. "Red" Murphy; Thomas Louk; Peter Butler; Charles "Flip" Crowley; William A. Maynard, Jr.; Calvin Hudson; Kimanthi–Mpingo, a/k/a Edward Dingle; and Ken–Du, a/k/a Willie Stokes, on behalf of themselves and all others similarly situated, Plaintiffs,

Akil Al–Jundi, Plaintiff–Appellant,

v.

The ESTATE OF Nelson ROCKEFELLER, Defendant–Appellee.

No. 1067, Docket 88–2527.

United States Court of Appeals, Second Circuit.

Argued June 2, 1989.

Decided Sept. 15, 1989.

Michael E. Deutsch, Chicago, Ill. (Dennis Cunningham, San Francisco, Cal., Elizabeth Fink, Brooklyn, N.Y., of counsel), for plaintiff-appellant.

William E. Jackson, New York City (Adlai S. Hardin, Jr., Richard H. White, Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for defendant-appellee.

Before NEWMAN and MINER, Circuit Judges, and WARD, District Judge.*

MINER, Circuit Judge:

Plaintiff-appellant Akil Al–Jundi appeals from a judgment entered in the United States District Court for the Western District of New York (Elfvin, J.) dismissing the section 1983 claims, *see* 42 U.S.C. § 1983, asserted against the Estate of Nelson A. Rockefeller ("Estate") by the class of which Al–Jundi is a member.[1] *See Al–Jundi v. Estate of Rockefeller*, No. CIV–75–132E, 1988 WL 103346 (W.D.N.Y. Sept. 28, 1988). Al–Jundi, along with other parties named in the amended complaint, had instituted a class action against Governor Rockefeller, in his official and individual capacities, and other New York State officials and correctional personnel, based on defendants' roles in the quelling of the 1971 Attica prison uprising. The section 1983 claims were premised on violations of the cruel and unusual punishment clause of the eighth amendment and the due process and equal protection clauses of the four-

---

* The Honorable Robert J. Ward, United States District Judge, Southern District of New York, sitting by designation.

1. Although the notice of appeal in this action names Al–Jundi as the only appellant, we note that the other members of the class were, by implication, "otherwise designated, however inartfully, in the notice of appeal," *Torres v. Oakland Scavenger Co.,* — U.S. ——, 108 S.Ct. 2405, 2409, 101 L.Ed.2d 285 (1988), by virtue of the fact that the amended complaint lists all plaintiffs as "representatives of the plaintiff class." It thus seems evident that both the Estate and the court could "determine with certitude," *id.,* that the entire class appealed the judgment. *See King v. Otasco, Inc.,* 861 F.2d 438, 442–43 (5th Cir.1988).

teenth amendment. During the pendency of the action, the Estate was substituted "in the place and stead of defendant Rockefeller." *Al–Jundi v. Rockefeller,* 88 F.R.D. 244, 245 (W.D.N.Y.1980).

The district court granted summary judgment for the Estate, holding, *inter alia,* that, based on his limited participation in the retaking of the prison, Rockefeller had not violated plaintiffs' constitutional rights, and that, in any event, the Governor, and derivatively, the Estate, were immune from suit under the doctrine of qualified immunity. The court thereafter entered a final judgment, pursuant to Fed.R. Civ.P. 54(b), permitting plaintiffs to appeal the dismissal of the claims against the Estate. *See Al–Jundi v. Estate of Rockefeller,* No. CIV–75–132E, 1988 WL 128567 (W.D.N.Y. Nov. 30, 1988).

On appeal, Al–Jundi argues that summary judgment was improper, contending that material questions of fact exist concerning principally (1) the failure of the Governor to control and supervise the officers who conducted the armed assault of the prison; (2) information allegedly possessed by Rockefeller prior to the assault, which, he claims, indicates that a significant degree of danger would attend the use of force to rescue the hostages and retake the prison; and (3) a supposed nexus between the decision to retake the prison by force and Rockefeller's political aspirations. We conclude that Rockefeller did not violate the civil rights of any member of the plaintiff class, and, accordingly, we affirm.

## BACKGROUND

On September 9, 1971 at approximately 8:45 AM, more than 1200 inmates at the Attica prison rioted, attacking and seizing as hostages forty-nine correction officers. Within less than two hours, the inmates were reported to be in control of a substantial segment of the prison, including a prison yard known as "D–Yard." Later that morning, state police and correction officers regained control over portions of the prison. Eventually, eleven hostages were released, but the inmates kept the others; one of the hostages who was released, Cor-

rection Officer William Quinn, died later from wounds inflicted by the inmates.

Russell Oswald, then the New York State Commissioner of the Department of Correctional Services, arrived at the scene at about 2:15 PM on the day of the uprising. He had been given by Rockefeller "complete authority over and responsibility for" handling the crisis. Included among Oswald's responsibilities was the authority to conduct and, should they prove unsuccessful, terminate negotiations. He was charged also with the responsibility to decide whether a rescue operation was necessary and, if so, when to conduct it.

Upon arriving at the scene and being briefed by the superintendent of the prison, Oswald ordered that the effort to retake the prison by force be stopped, and decided instead to seek a negotiated end to the insurrection and release of the hostages. Negotiations commenced late in the afternoon of September 9. An Observers Committee, formed at the request of the prisoners, acted as mediator in the negotiations between the prisoners and Oswald. During the course of negotiations, which lasted until the morning of September 13, the inmates submitted a list of thirty-four demands, most of which sought improvements in prison conditions. Oswald agreed in substance to twenty-eight of the demands; the Governor approved Oswald's decision to accept those demands. Two demands that were disputed, however, were the inmates' requests for complete amnesty for all criminal acts committed during the insurrection and, for inmates desiring to leave the United States, transportation to "non-imperialist nations." The inmates rejected the twenty-eight point counter-proposal, holding out for amnesty and transportation.

By September 12, the impasse in the negotiations led to increased tensions in the prison. Two inmates were seriously injured, presumably by fellow prisoners; the rioters permitted one of the injured inmates to leave the prison yard. The death toll among hostages and inmates already had climbed to four. Meanwhile, as news of Officer Quinn's death was reported by

the media, the inmates hardened their demand for complete amnesty, which apparently had become the focal point of the discussions among the inmates, the Observers Committee and Oswald.

At 9:35 PM on September 12, the Observers Committee met with Oswald and requested, as it had before, that Rockefeller come to Attica to help resolve the conflict; the Committee then dissolved itself. The Governor responded that his · presence would serve no purpose, and that he would come only if the prisoners released the hostages and returned to their cells. In the meantime, Oswald decided that a final offer and plea to release the hostages would be made to the inmates the next morning (September 13), and that if the offer was not accepted, the hostages would have to be rescued and the prison recovered by the state police.

On September 13 at approximately 7:45 AM, Oswald delivered to the inmates a note expressing his desire to "achieve a peaceful resolution of the situation" and urging release of the hostages unharmed, help in restoring order to the facility, and a response within the hour. At about 9:00 AM, the inmates began parading eight of the hostages, who were bound and blindfolded, on various catwalks around the prison; each hostage was held, with a knife to his throat, by an inmate. Shortly thereafter, the inmates twice rejected Oswald's "urgent appeal." It was then that Oswald decided that the prison would have to be retaken and the hostages rescued.

A variety of factors, in addition to the events described above, led Oswald to conclude that further negotiation would prove fruitless and that the only alternative left was to retake the prison. He considered the "brutality" of the initial rioting; the parole records of the rebellious inmates, many of whom had been convicted of "vicious" crimes; the refusal of the inmates to release injured or sick hostages without "fresh" replacements; the fact that the inmates had access to, and actually had equipped themselves with, an arsenal of weapons; the fact that the inmates continuously were erecting barricades and other fortifications to impede any possible assault; and the concern that a rescue operation would become substantially more difficult were the hostages to be moved from the prison yard to one of the cell blocks. He thus sought and received authorization from the Governor to order the state police to plan and conduct an operation to rescue the hostages and retake the prison.

The actual plan for retaking the prison was formulated principally by Major Monahan of the state police, with the assistance of other state police and prison officials. Essentially, the plan consisted of sending into the prison a twenty-seven member rescue squad to secure the safety of the hostages. The squad was to be supported by two eighty-member teams entering the prison at various points of access. During the operation, a national guard helicopter was to drop tear gas onto the prison yard to immobilize the inmates and minimize violence, injury and loss of life.

The Governor played no role in either the formulation or implementation of the rescue plan. In fact, he had no advance knowledge of the plan chosen; he merely ratified the decisions to abandon negotiations and to devise instead a plan to retake the prison, by force if necessary. Later, he issued instructions that correction officers were to be excluded from the operation, because of their possible emotional involvement, and that matters were to be left in the hands of the more experienced and better trained state police. He ordered, as well, that firearms not be used unless necessary for self-defense or to protect the safety of a hostage or fellow officer, and authorized the use of the tear gas.

Led by Major Monahan, a contingent of state police and, despite the Governor's orders, prison guards, county sheriffs' officers and park police conducted the rescue and retaking operation on Monday morning, September 13. Under a cloud of tear gas, ten hostages and twenty-nine prisoners were killed and another three hostages and eighty-five prisoners were wounded by gunfire. After order was restored, several prisoners were tortured, beaten and threatened. *See Inmates of Attica v. Rockefel-*

*ler,* 453 F.2d 12, 18–19 (2d Cir.1971) (granting preliminary injunction restraining state officials from engaging in physical abuse, tortures, beatings and similar conduct). Al–Jundi attributes the mayhem that occurred both during and after the operation to a "command vacuum" (i.e., lack of high-level officials in charge) and, correspondingly, the Governor's lack of supervision and control.

This action was commenced in the Southern District of New York in 1974 by those prisoners present in D–Yard on the day of the rescue operation and the legal representatives of the prisoners who died during the insurrection. The action subsequently was transferred to the Western District of New York, where in October 1979 it was certified as a class action. *See Al–Jundi v. Estate of Rockefeller,* No. CIV–75–132E, 1987 WL 8948 (W.D.N.Y. April 3, 1987). Named in the amended complaint as defendants were Governor Rockefeller, for whom the Estate was substituted in 1980 after Rockefeller's death, and numerous other parties linked in some capacity to the prison retaking but not relevant to this appeal. All defendants were sued in their individual and official capacities.

Seeking compensatory and punitive damages in excess of $4 billion, plaintiffs alleged causes of action under sections 1983 and 1985(3), 42 U.S.C. §§ 1983, 1985(3), predicated on violations of the fifth, eighth, ninth, thirteenth and fourteenth amendments. As to Rockefeller, Al–Jundi argued—and again argues on appeal—that the Governor failed to supervise and control not only the rescue and recovery operation, but the entire crisis. Al–Jundi claimed that the Governor knew in advance the dangers inherent in the use of force, and that Rockefeller was advised against an assault on the prison by Congressman Herman Badillo and Clarence Jones, publisher of *The Amsterdam News,* both of whom he had personally requested to go to Attica and join the Observers Committee. Al–Jundi alleged that the Governor disregarded the advice of Badillo and Jones because of "overwhelming political pressure and sentiment to send in the troops." Rockefeller had indicated, according to Ba-

dillo, that "he had no choice but to accede to that pressure regardless of the consequences to the hostages ... [and] clearly implied that he was concerned with ... his own political reputation," as he was planning a run for the White House and sought to project a law and order image. Al–Jundi argued also that the Governor had been informed that the use of force would lead to disastrous results because the inmates had dressed the hostages in prison garb.

On August 14, 1987, the Estate moved for summary judgment on the grounds that: (1) the decision to retake the prison with armed law enforcement personnel did not violate the inmates' constitutional rights; (2) Rockefeller played no part in the actual retaking and thus cannot be held liable under sections 1983 and 1985(3); and (3) the Estate is entitled to prevail on the defense of qualified immunity. The district court granted summary judgment for the Estate, holding that (i) plaintiffs failed to show—and "Rockefeller's limited participation in the retaking ... does not support a reasonable inference"—that the Governor acted wantonly or maliciously; Rockefeller consequently did not violate the inmates' rights under the eighth amendment's cruel and unusual punishment clause or the fourteenth amendment's due process clause; (ii) plaintiffs did not "present specific allegations of ... conspiracy" to violate the eighth and fourteenth amendments; nor did they establish "racial or class-based invidiously discriminatory animus" to support a conspiracy or substantive claim under the equal protection clause; and (iii) the Estate was entitled to immunity from suit since Rockefeller's conduct had not violated clearly established law.

As all the claims asserted by plaintiffs against the Estate were dismissed by the summary judgment, the district court thereafter directed the entry of a final judgment pursuant to Fed.R.Civ.P. 54(b), permitting Al–Jundi the opportunity for immediate appellate review of those claims, and in particular "the issue of the ... Governor's supervisory liability." This appeal ensued, and is apparently limited to Al–Jundi's section 1983 claim under the

eighth amendment and the fourteenth amendment's due process clause. For the reasons that follow, we affirm.

### DISCUSSION

In granting the Estate's motion for summary judgment, the district court determined that under the standard articulated by the Supreme Court in *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–27, 106 S.Ct. 2548, 2552–55, 91 L.Ed.2d 265 (1986), and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986), Al–Jundi did not come forward with sufficient evidence to raise a genuine issue of material fact. We agree with that determination.

■ Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of right secured by the Constitution and laws," *Rizzo v. Goode,* 423 U.S. 362, 370–71 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976) (quoting 42 U.S.C. § 1983); *see Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). As an initial matter, we note that a section 1983 claim for damages against a state official can only be asserted against that official in his or her individual capacity. *Cf. Will v. Michigan Dep't of State Police,* — U.S. —, 109 S.Ct. 2304, 2311–12 105 L.Ed.2d 45 (1989).[2] Therefore, this appeal is tenable only insofar as Rockefeller is named in his personal capacity.

■ Where damages are sought in a section 1983 action, the defendant must be responsible for the alleged constitutional deprivation: "[T]he general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required." *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *see Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam) (plaintiff must demonstrate "personal in-

volvement" of state commissioner of corrections and superintendent of prison, not mere "linkage in the prison chain of command"). *See generally City of Canton, Ohio v. Harris,* — U.S. —, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). Since liability cannot attach under the doctrine of *respondeat superior,* we must look instead to the extent of Rockefeller's involvement in the unconstitutional conduct alleged.

Rockefeller's part in the decision to retake the prison and rescue the hostages, and in the formulation and implementation of the plan to carry out that decision, simply did not rise to the level of personal involvement necessary to establish liability under section 1983. True, the Governor was kept abreast of the events that transpired at the prison throughout the crisis; but that alone is not sufficient to hold him responsible for any wrongs committed by others. "The fact that he was in a high position of authority is an insufficient basis for the imposition of personal liability." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *see Turpin v. Mailet,* 579 F.2d 152, 167 (2d Cir.) (in banc) ("notions of *respondeat superior* have not been incorporated into § 1983 to permit the imposition of liability in damages upon supervisory personnel for the wrongs of their subordinates"), *cert. denied,* 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662 (1978).

Rockefeller's role in the entire affair was limited to his ratification of Oswald's decisions to abandon negotiations, order the state police to formulate a plan to regain control of the prison, and approve commencement of the actual retaking. Such "involvement" simply is not sufficiently related to the alleged unlawful conduct. *See Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974) (plaintiff must allege that defendant authorized particular conduct said to be unlawful). Rockefeller did not engage

---

**2.** In *Will,* the Supreme Court observed that a state official acting in his or her official capacity is not a "person" within the meaning of § 1983. 109 S.Ct. at 2311–12. Because a suit against that official in his or her official capacity "is no different from a suit against the State

itself," *id.* at 2311, damages can be obtained only when the official is sued in his or her personal capacity. *See Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); *accord Dwyer v. Regan,* 777 F.2d 825, 835 (2d Cir.1985).

in or authorize any of the brutalities alleged. That Rockefeller delegated authority to the appropriate officials in the state command in no way suggests that he should be liable to pay damages for the events that ultimately occurred allegedly as a result of unwarranted implementing decisions of these officials. Nor do Rockefeller's recommendations regarding certain safety measures to be followed during the operation and instructions to the rescue team not to use force unless necessary imply the requisite personal involvement or responsibility.

■ Of course, as Al–Jundi observes, even though "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," *Williams v. Smith,* 781 F.2d at 323 (quoting *McKinnon,* 568 F.2d at 934), direct participation is not always necessary. Indeed, a supervisory official may be personally liable if he or she has "actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir. 1989); *see Williams v. Smith,* 781 F.2d at 323–24 (supervisory liability attaches where official "grossly negligent in managing subordinates who caused the unlawful condition or event"); *cf. Harris,* 109 S.Ct. at 1204–05, 1206 (municipality liable only where the failure to train employees amounts to a "deliberate indifference" to the constitutional rights of its inhabitants).

■ Based on this standard of supervisory responsibility, Al–Jundi urges that the proper inquiry is "whether Rockefeller took proper, reasonable steps to prevent or ameliorate [the] harm, including fulfilling his duty to give or ensure proper instruction and supervision." Al–Jundi contends that Rockefeller not only failed properly to discharge this duty, but was deliberately indifferent to known risks of danger. *See Haynesworth v. Miller,* 820 F.2d 1245, 1261 (D.C.Cir.1987) ("[w]hen inaction in the face of a substantial threat of harm is shown, it can be said that the supervisor acquiesced in the resulting constitutional

violation, thereby 'linking' the non-feasance with the injury"); *McCann v. Coughlin,* 698 F.2d 112, 125 (2d Cir.1983); *see also Wright v. McMann,* 460 F.2d 126, 134–35 (2d Cir.), *cert. denied,* 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972).

There is no basis for imposing supervisory liability upon the Estate under the circumstances revealed here. As the Supreme Court recently explained, the "deliberate indifference" standard does not apply in the prison context to the making and carrying out of decisions "involving the use of force to restore order in the face of a prison disturbance." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). In *Whitley,* a case in which an inmate seized one hostage during a prison riot, the Court stated that deference to prison administrators necessarily "extends to a prison security measure taken in response to an actual confrontation with riotous inmates," *id.* at 322, 106 S.Ct. at 1085; *see Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988). Given the facts of the Attica situation—namely, the occurrence of a full-scale prison uprising resulting in the control by armed and dangerous prisoners of substantial portions of the prison, the taking of a sizeable number of hostages, the imminent risk of harm faced by those hostages, and the breakdown of negotiations—we find no fault with the district court's refusal to substitute its judgment "for that of officials who have made a considered choice," *Whitley,* 475 U.S. at 322, 106 S.Ct. at 1085. Certainly Governor Rockefeller's authorization of the decision to retake the prison and rescue the hostages, an undertaking designed to "resolve a disturbance ... that indisputably pose[d] significant risks to the safety of inmates and prison staff," *id.* at 320, 106 S.Ct. at 1085, was not made with deliberate indifference to the constitutional rights of the inmates of Attica.

■ The district court gave as "[a]nother valid ground" for granting the Estate's motion for summary judgment the defense of qualified immunity. We agree with this determination as well, and note that because this defense provides immunity from

suit, and not merely a shield to liability, *see Neu v. Corcoran,* 869 F.2d 662, 664 (2d Cir.1989), the amended complaint properly was dismissed on this ground.

The Supreme Court has instructed that the defense of qualified immunity is available only to the extent that the defendant's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987) (whether qualified immunity defense applies "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken" (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738)); *accord Yalkut v. Gemignani,* 873 F.2d 31, 35 (2d Cir.1989). In *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987), we added that "even if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights."

Al–Jundi contends that, at the time of the Attica riot, the law was well-established that the "cruel treatment of prisoners by prison officials" was prohibited under the eighth amendment and the fourteenth amendment's due process clause. *See Graham v. Connor,* —— U.S. ——, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989) (under present state of the law, "[a]ny protection that 'substantive due process' affords convicted prisoners against excessive force is ... at best redundant of that provided by the Eighth Amendment"); *Whitley,* 475 U.S. at 327, 106 S.Ct. at 1088. We recognize that official action is not protected by qualified immunity when "the very action in question has previously been held unlawful" and when "in light of the pre-existing law the unlawfulness must be apparent," *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039. However, we have

yet to find a case in which the governor of a state has been held liable for deprivation of constitutional rights or unlawful conduct arising from a decision to retake a prison and rescue hostages held by rioting inmates who have rejected a negotiated settlement.

## CONCLUSION

The judgment of the district court is affirmed.