[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO SET ASIDE THE VERDICT
The plaintiff was formerly an officer in the Shelton Police Department who while head of a unit of that department was CT Page 5156 arrested on sexual assault charges. At trial, it was established that the complainant was an informant; pursuant to his duties the plaintiff had had contact with this individual.
The plaintiff was arrested in October of 1989 and the charges were nolled on January 24, 1991. The plaintiff then sued the defendant who was the chief of police at the time of these events. The plaintiff claimed the defendant was primarily responsible for the investigation that led to his arrest. The defendant was sued for false arrest and malicious prosecution.
(1.)
As to both the claims the defendant argues correctly that an essential element is proof that there was a favorable resolution of the underlying criminal charge. Here the charges were nolled and the defendant argues this was not a favorable disposition.
The defendant notes that Section 661 of the Restatement (Second) of Torts states that formal abandonment of proceedings "is not a sufficient termination in favor of the accused if the abandonment is due to the impossibility or impracticability of bringing the accused to trial." Even under the Restatement view the burden would be on the defendant to establish "the impossibility or impracticability of bringing the accused to trial."
In any event, under Connecticut law it has been said that: "It is not necessary that the accused should have been acquitted. It is sufficient if he was discharged without a trial under circumstances amounting to an abandonment of the prosecution without request from or by an arrangement with him," See v.Gosselin, 133 Conn. 158, 160 (1946), cf Halberstadt v. N.Y. LifeInsurance Co., 86 N.E. 801 803 (N.Y., 1909); Russo v. State of NewYork, 672 F.2d 1014, 1019 (CA2, 1982). In Singleton v. City of NewYork, 632 F.2d 185 (CA2, 1980) the court held in a § 1983 malicious prosecution action that an "adjournment in contemplation of dismissal" under New York procedure was not "a termination in favor of the defendant", id. p. 195. When that particular program is granted the question of the accused's guilt is left open. The court also reasoned that if such a program was considered a favorable disposition, prosecutors would be reluctant to offer it if they knew suit could be brought after the case was dismissed. Roesch v. Otarola, 980 F.2d 850 (CA2, 1992) reached the same conclusion about our state's accelerated CT Page 5157 rehabilitation program and noted if a Section 1983 action could be brought after a accelerated rehabilitation dismissal the State may not retain the program and courts might be reluctant to grant it — it is also true that prosecutors might oppose such a program on a more regular basis if that were the case.
Here the charges were nolled. They were not Nolled at the instigation of the plaintiff, there were apparently nolled because the complainant did not appear in court. The latter fact alone suggests that the failure to proceed "implies a lack of reasonable grounds for the prosecution," Loeb v. Tietlebaum,432 N.Y.S.2d 487, 494 (1980). When the state nolles a charge because its complainant does not appear for trial it is not doing the defendant a gratuitous favor by a nolle — it has no other choice but to do so. Thus, the fact that a nolle under such circumstances would be considered a favorable termination permitting state and federal civil rights claims has nothing to do with encouraging or discouraging the prosecutorial decision to nolle the case.
The court does not believe it was erroneous to conclude that the nolle entered in this matter was a favorable disposition for the purposes of the claims made in this case.
(2.)
The defendant also argues that the verdicts must be set aside because under Cartier v. Lussier, 955 F.2d 841, 845 (CA2, 1992) there was sufficient probable cause for the arrest even if the false material is set aside and facts allegedly omitted from a hypothetical warrant which would then be subject to review. In considering a motion to set aside a verdict in civil rights cases such as this and the question of whether there was sufficient evidence for a jury to rule in favor of the plaintiff on such claims, the issue is inextricably bound up with the question of qualified immunity. This court recently dealt with these issues in Ham v. Greene, et al, CV91-0322755, New Haven JD, (1997) and has attached the relevant portion of the decision in that case as an appendix. The court relies on the general reasoning and analysis set forth there especially at pp 4 through 16. The court believes that an analysis of Cartier v. Lussier, supra and Golinov. City of New Haven, et al, 950 F.2d 864 (CA2, 1991) must be made and the cases can be harmonized. It is important to examine the facts of a particular case to see if the evidence presented a question for the jury when civil rights claims such as this are CT Page 5158 made.
In Cartier the facts on which probable cause depended came from a neutral witness with no reason or motive to fabricate a story, an independent accident reconstruction report, and inferences drawn from the damage to the car in which the decedent was riding. The facts opposed to probable cause came from friends or relatives of the victim, one of whom gave a previous conflicting statement.
In Golino, the very statement on which probable cause was based came from a witness who gave inconsistent statements and attempted to recant the statement. Among other facts noted by the court were the fact that witnesses gave descriptions of the perpetrator that did not match Golino and that the police knew Golino's blood type but did not have him tested for his blood type.
This is a close case but the court believes it was one for the jury to decide in that the very relationship between the plaintiff as a supervising officer of a drug enforcement unit and the informant role of the complainant would require an investigating officer to be cautious in investigating completely uncorroborated assertions of this individual. She was not cooperative during the investigation as to the whereabouts and delivery of the clothing she was wearing the night of the alleged assault and she took no steps on her own to get hospital treatment or testing. What is somewhat peculiar in this case is that one of the investigating officers who had contact with the complainant did not think she was credible; and that officer in fact thought she was lying and told, his immediate superior, another officer assigned to the case his opinion. That officer, Lt. Hurliman was somewhat more diplomatic; he testified that in his view the complainant was not the most credible person he had ever dealt with. These officer's opinions were based apparently on their meetings with the complainant, her failure to be as cooperative as they would have liked and factors such as her misstatement as to the location of the clothing she said she was wearing at the time of the alleged assault.
In Cartier, the court said in discussing qualified immunity that: "A subjective inquiry into an official's personal belief is rejected in favor of the objective analysis of what a reasonable officer in the defendant's position would believe", 955 F.2d at page 843. This seems to be a more appropriate consideration when CT Page 5159 the issue in a particular case is that an officer personally and honestly believes in a suspect's guilt but the objective facts do not support such a belief. But officers are trained to weigh the credibility of people they come in contact with during an investigation. It is not uncommon for them to include in a warrant opinions about an informant's reliability or trustworthiness based on past dealing with the informant. The point here is that the officer's conclusions about the complainant's credibility were not included in the arrest warrant affidavit and it certainly cannot be said that this information would not likely be given weight by a magistrate considering the issue of probable cause or a reasonable officer trying to determine if he or she had probable cause, cf Golino at 950 F.2d page 871.
This court is aware of the fact that there is an objective reasonableness standard developed by the federal courts to determine the propriety of any belief by officers that probable cause existed. But an officer's opinion on credibility should be regarded as an objective fact when the officer concludes a complainant is not credible — their belief to the contrary is accepted as such when they opine to a judge an informant is reliable. It would be a rather surprising doctrinal turn of events if an officer's conclusion that an informant is reliable is taken as an objective factor supplying an element of probable cause in an arrest warrant for an ordinary citizen but an officer's conclusion that a complainant is lying or is not reliable is not an objective factor in deciding whether there is an objective basis to conclude there is probable cause to have arrested a citizen.
The court concludes the foregoing facts and considerations alone are sufficient to allow the jury's verdict to stand. As inGolino and the Ham case the very basis of the probable cause determination is suspect — the veracity of the complainant here or as in those cases key witnesses.
But even if the just mentioned credibility factor can be said not to permit the verdict to stand, the officers' opinion on credibility added to other factors in this case not only support their conclusion about lack of credibility but, in light of the credibility issue, make the failure to wait for the results of forensic testing of the plaintiff's vehicle a jury question.
Here, the complainant's story was uncorroborated. It is CT Page 5160 true that medical testing of the defendant or of the clothes she was wearing at the time of the assault was not very probative due to the time that had elapsed from the date of the incident. But these delays were caused by the failure of the complainant to report the incident for a substantial period of time. She even misstated to the police where her clothing was located, first saying it was with her attorney.
The crime allegedly happened in the plaintiff's car. It was reported to the Shelton police some two weeks after it happened. The police did not request a forensic examination of the vehicle for another two weeks and the warrant was procured without waiting for the results of the forensic testing which indicated no evidence of a crime were found in the car. This testing was not as dispositive as that referred to in Golino v. City of NewHaven, supra, but it had some probative value and, in this case, sufficient probative value considering the concerns with the credibility of the complainant to make failure to wait for its results with subsequent inclusion in a warrant a material omission which could lead a jury to conclude that a reasonable officer would have concluded that there was no probable cause for the arrest.
(3)
Even if there was a basis on which to find the plaintiff had established his claims, the defendant argues that the verdict should be set aside because there was no credible evidence on which the jury could conclude that he was liable for such wrongful conduct. In a Section 1983 civil rights action, the defendant sued must be responsible for the alleged constitutional deprivation. In this case the court gave an instruction fromModern Federal Jury Instructions, Civil, Sand, Vol. 4, instruction 87-80 entitled "Supervisory Officials". The question is, applying that instruction, could the jury have found, based on the evidence, that the defendant was liable. There are numerous cases dealing with the liability of supervisory officials. Some of the leading ones are Wanger v. Bonner,621 F.2d 675, 679 (CA 5 (1989); Harris v. Friedline, 585 F. Sup. 734,738 (E.D.Va., (1983); Fratiello v. Mancuso, 653 F. Sup. 775,786 (D.RI, (1987); Hansen v. Black, 885 F.2d 642, 645 (CA 9, 1989); Liscio v. Warren, 718 F. Sup. 1074, 1079 (D.Conn. 1989); Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (CA 2, 19889); Tilson v. Forest City Police Department, 28 F.3d 802,806 (1994); Baker v. Putnal, 75 F.3d 190, 199 (CA 5, 1996). CT Page 5161
As noted, for a defendant supervisory officer to be held liable for a § 1983 violation his or her personal involvement in the constitutional infraction must be shown. This can be established by the official's direct participation in the wrongful conduct. Absent direct participation, "the general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required."Johnson v. Glick, 484 F.2d 1028, 1034 (CA 2, 1973). But in the case of a supervisory official, direct participation is not always necessary: "Indeed, a supervisory official may be personally liable if he or she has `actual or constructive notice' of unconstitutional practices and demonstrates `gross negligence' or `deliberate indifference' by failing to act." Al-Jundiv. Estate of Rockefeller, 885 F.2d at page 1066 — court cited cases which held that supervisory liability attaches where an official is grossly negligent in managing subordinates who caused an unlawful event and where city's failure to train employees amounts to a gross indifference to citizen's rights.
In Liscio v. Warren, supra, the court said at 718 F. Supp. page 1079 that a supervisory official is directly liable for direct participation in the event but also:
 ". . . a supervisory official may be liable if he (sic) learned of the violation and failed to remedy the wrong, if he (sic) created or permitted the policy or custom under which the unconstitutional practices occurred, or if he (sic) was grossly negligent in managing subordinates who caused the violation. . . ."
The court will first discuss some of the facts, relevant to deciding this issue, which the jury could have found. The charges against the plaintiff are among the most serious and heinous crimes in our penal code. They were made against a ranking officer of the police department of which the defendant was chief. That officer was also the head of a regional narcotics drug enforcement unit and the charges were made by an individual who was an informant in the operation of that unit. The defendant picked the chief investigative officer for this matter, Aurigemma, and also Officer Hurliman. He also selected a young officer, Federowicz, upon the advice of the two officers he had already selected. The defendant not only chose the officers CT Page 5162 who would conduct the investigation, he stated it was his sole decision that the Shelton Police Department would conduct the investigation. He was not aware of nor did he inform himself of the investigative experience of any of the individuals he selected to conduct an inquiry into the charges. The defendant had himself been involved in the investigation of five or six rape cases. Officer Federowicz had had no prior experience investigating sexual assault cases. Hurliman could not remember whether he did in 1989 when these events occurred. The defendant said Aurigemma might have had experience investigating rape cases but he could not recall taking the time to find out about this. All of this did not concern the defendant because he felt if they had any problems during the investigation they could discuss them with the state's attorney's office.
The defendant said he spoke to Aurigemma on a daily basis, spoke to Hurliman once a week and met with Federowicz on perhaps one occasion. But he testified that he tried to keep himself in the dark about both the general and specific aspects of the investigation in the Cislo case. He felt the investigation was being handled properly. The jury, however, could have found that he had a more intimate involvement with the conduct of the investigation. As noted, he decided which department was going to conduct it, selected the officers who would carry it through to completion and the jury could also have found that he ordered the plaintiff's car seized in order that a search might be conducted of the vehicle where the alleged crime was said to have occurred.
Also, the testimony of Hurliman and Federowicz was different from that of the defendant and the jury could have found that he did not keep himself in the dark about the progress of the investigation but was informed of how it was being carried on and of various developments having to do with it. Officer Federowicz testified that give-and-take discussions were held on the two occasions he met with the defendant and Hurliman. All three of them threw them out ideas, if the defendant gave a reasonable idea it would be followed up. The defendant was told the facts they had gathered, where they were going and what to do next. Federowicz testified that he did not tell the defendant he thought the complainant was lying although he had told this to Hurliman, his superior. Federowicz also testified he told the defendant some of the exculpatory evidence.
Hurliman testified that he had met with the defendant many CT Page 5163 times during the investigation. He denied being pressured by the defendant but as to being controlled by him during the investigation, Hurliman responded that he was, after all, the chief. Hurliman said he kept the defendant informed of the developments in the case on pretty much a daily basis and he had no reason to hold back any information from the defendant when he talked with him.
This is not a case like Al-Jundi v. Estate of Rockefeller,
supra, where the participation in the actions that are claimed to be wrongful was tangential or marginal involving only general directions or approval of prospective actions. The jury could have found that the defendant, on practically a daily basis, was informed of developments in this case and even offered suggestions as to how it was to proceed while it was actually going on. At the time these conversations occurred, he, after all, was the chief talking to subordinates. He even ordered the plaintiff's car to be seized and processed for information. It strains credulity to believe, in light of Hurliman's testimony, that he would not have been informed of his own handpicked officers' views on the complainant's credibility.
Furthermore, in light of the lack of testimonial or scientific corroboration of the complainant's story and the fact that the defendant picked at least two officers who apparently had no experience in investigating sexual assaults and did not bother to inform himself as to the experience of any one of the three he selected in this regard, this court cannot say that, in failing to press his officers as to their opinion as to the complainant's credibility, all of this did not add up to "deliberate indifference" to a citizen's rights of a grossly negligent kind.
In other words, the jury could have found the defendant was a direct participant in the investigation and he participated as a chief dealing with subordinates — he cannot then parcel out a piece of information that he was not or may not have been told concerning a crucial factor such as the complainant's credibility and argues this absolves him from supervisory liability. Ascertainment of credibility would be a necessary, let alone common sense, requirement for any supervisor participating in an investigation to the extent this defendant could be found to have participated. Or to look at it another way, the defendant's actual participation in the investigative process gave him sufficient "constructive notice" of unconstitutional activity. CT Page 5164
The court finds the jury's verdict and necessary finding of supervisory responsibility was supported by the evidence. The motion to set aside the verdict is denied.
Corradino, J.