Jan A. SIGMON, Plaintiff,

v.

**PARKER CHAPIN FLATTAU & KLIMPL, Defendant.**

**No. 93 Civ. 7123 (PKL).**

United States District Court, S.D. New York.

Oct. 6, 1995.

Robert D. Kraus, New York City, for plaintiff.

Parker Chapin Flattau & Klimpl, New York City (Peter M. Panken, Stacey B. Babson, of counsel), for defendant, pro se.

LEISURE, District Judge:

This is an action brought by Jan A. Sigmon, Esq. ("plaintiff"), against her former employer, the law firm of Parker Chapin Flattau & Klimpl ("defendant"). In her complaint, plaintiff alleges that she was discriminated against, and ultimately terminated by, defendant because she is a woman, became pregnant, and had a child. Plaintiff alleges that defendant's discriminatory practices violated: (1) Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e–2(a)(1); (2) section 206(d)(1) of the Equal Pay Act, *see* 29 U.S.C. § 201 et seq; (3) section 296 of the New York Human Rights Law, *see* N.Y. Executive Law § 296 (McKinney 1993 & Supp. 1995); and (4) the New York common law of prima facie tort, intentional infliction of emotional distress, and negligence.

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, defendant has moved this Court for summary judgment dismissing all or any of plaintiff's causes of action. Defendant also has moved this Court, based on an allegation that plaintiff misappropriated defendant's confidential documents, to deny plaintiff any post-trial damages, or, in the alternative, to limit damages, if any, to $27,015.36. Plaintiff has cross-moved for summary judgment to dismiss defendant's first and eighth affirmative defenses.

### BACKGROUND

Viewed in the light most favorable to the non-movant, the facts are as follows. Plaintiff, a 1985 graduate of Brooklyn Law School, joined defendant as an associate member of its corporate department in November of 1987. *See* Plaintiff's Affidavit in Opposition to Defendant's Summary Judgment Motion and in Support of Cross–Motion to Dismiss Affirmative Defenses ("Pl.'s Aff.") ¶ 3. Sometime around April of 1991, plaintiff announced to the corporate partners that she was pregnant. *See id.* ¶ 19. Plaintiff took maternity leave from November 4, 1991, through May 11, 1992. Plaintiff was terminated on July 31, 1992. After filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 3, 1992, plaintiff received a notice of right to sue letter on July 16, 1993. The instant action was initiated on October 14, 1993.

### A. *Alleged Discriminatory Conduct Targeting Plaintiff*

Plaintiff states that unlawful discriminatory conduct directed towards her began short-

ly after she announced her pregnancy. *See id.* ¶ 30. First, plaintiff states that the following rumor was spread around the firm: that plaintiff said she was planning on taking advantage of defendant by working short hours and weeks, but still be compensated as a full time associate, after her return from maternity leave. Plaintiff denies making this potentially reputation-damaging statement. *See* Pl.'s Aff. ¶ 30. Defendant admits that the rumor was reported at a meeting of the corporate partners. *See* Affirmation of Peter M. Panken, Esq. ("Panken Aff.") Ex. S.

Plaintiff also states that the corporate department "began to isolate me from participating in several firm activities in which I previously had been a significant participant." *Id.* ¶ 31. For example, plaintiff was not allowed to participate in the firm's recruiting process, which she had done in the past. *See id.* Although defendant attempts to rebut this claim by stating that the recruiting season was over when plaintiff returned from her maternity leave, *see* Affirmation of Mark Abramowitz, Esq. ("Abramowitz Aff.") ¶ 23, plaintiff's claim is that she was excluded from recruiting during her pregnancy. The firm was recruiting new associates at this time. *See id.*

Near the end of her pregnancy, just prior to her departure for maternity leave, plaintiff states that Lloyd Frank, Esq. ("Frank"), the chairman of the corporate department, made the following statement in plaintiff's presence, and while another pregnant corporate associate walked by: "With all these pregnant women around, I guess we should stop hiring women." *Id.* ¶ 34.[1]

On April 1, 1992, about six weeks prior to her return from maternity leave, plaintiff and Frank scheduled a breakfast meeting for the next morning at the Algonquin Hotel. Plaintiff assumed the breakfast meeting would be an informal discussion of firm matters. *See* Pl.'s Aff.Ex.U. To plaintiff's surprise, two other corporate partners attended the breakfast. *See id.* at ¶ 42. While defendant maintains that the meeting was simply a counseling session to update plaintiff on her status

at the firm before her return from maternity leave, apparently Bill Friedman, one of the partners at the meeting, told another partner that the meeting was in fact plaintiff's annual performance review. *See* Pl's.Aff.Ex. J. It was not the firm's customary policy to give such reviews outside of the office. According to a memorandum that plaintiff prepared for her files on April 2, 1992, the meeting began with Frank telling plaintiff how hard the two new male corporate associates were working. These two new associates were hired at the beginning of plaintiff's maternity leave, just after several other female corporate associates either voluntarily left the firm, went on maternity leave, or were terminated. *See* Reply Affirmation of Mark Abramowitz, Esq. ("Abramowitz Rep. Aff.") ¶ 10.

The rest of the meeting consisted of criticisms of the plaintiff made by the partners, with apparently little opportunity for her to respond. *See* Pl.'s Aff. ¶ 43 and Ex. U. The focus of the criticisms offered by the partners were on plaintiff's alleged poor attitude, her lack of commitment to the firm, and her alleged practice of occasionally presenting answers to legal questions without adequate research and review. The criticisms were not related to plaintiff's gender or her prior pregnancy.

After plaintiff returned from maternity leave on May 11, 1992, the number of hours she billed per month decreased dramatically. From the date of her return until her termination, plaintiff billed a total of 246 hours. *See* Pl.'s Aff.Ex. V. At this pace, she would have billed approximately 1,200 hours for the year. This is significantly less than the nearly 1,700 hours plaintiff billed two years prior to her pregnancy, and the nearly 2,000 hours she billed the year next year. *See* Pl's.Aff.Ex. Q. Plaintiff states that she requested more work, but was told by defendant that no work was available. By comparison, other corporate associates were billing substantial hours during this time. *See* Abramowitz Aff. ¶¶ 18, 20; Pl.'s Aff. ¶ 45 and Ex. V.[2]

---

1. While defendant denies that the comment was made, Frank did not supply an affirmation denying this allegation.

2. For the month of June in 1992, Jordan Horvath, Esq., billed 264.25 hours, Mitchell Portnoy, Esq., billed 251.25 hours, and Gary Simon, Esq.,

In July of 1992, Mark Abramowitz, the managing partner of the firm, informed the corporate department that it would need to lay off four, possibly five, associates. *See* Defendant's Rule 3(g) Statement ("Def's. 3(g)") ¶ 7. Defendant alleges that to determine which corporate associates to lay off, each corporate partner was polled privately. *See* Affirmation of Mark Hirsch, Esq. ("Hirsch Aff.") ¶¶ 3, 4. According to the recollection of the corporate partner conducting the poll, plaintiff was one of two associates listed by each of the nine corporate partners as someone to terminate. *See id.* ¶ 6. Defendant asserts that the corporate partners chose to lay off plaintiff based on her professional evaluations. *See* Panken Aff.Ex. L. The only record of this decision is an incomprehensible page of hand-written notes. *See* Reply Affidavit of Stacey B. Babson ("Babson Aff.") Ex. EE. While defendant is a sophisticated law firm with a separate Labor and Employment Law practice group, *see* Pl's. Aff. ¶ 4, it cannot recall if any members of this group were consulted during the time plaintiff was terminated.

### B. *Alleged Discriminatory Conduct Directed Towards Other Female Associates*

Defendant has experienced problems with other female associates upon their return from maternity leave. The firm's maternity leave policy allows part-time return in some situations, but does not provide it as a right. One associate, Abby Weiner, Esq., initially had her request to return part time from maternity leave denied. Ultimately, after Weiner protested that her treatment was unfair, *see id.* Ex. L, defendant granted her request. Even though she had been described in her professional evaluations as "terrific" in the fall of 1989, *see* Pl's. Aff.Ex. H, after her return in 1991 she was described as a "problem." *See id.* Ex. M. Weiner voluntarily left the firm in the fall of 1991.

Another female associate, Mara Manin, Esq., also experienced gender-related prob-

lems similar to those alleged by plaintiff. For example, when Manin agreed, at a partner's request, to work over a weekend, she asked if she could bring her infant son to the office, because she was unable to secure child care. The partner refused to allow this, despite the fact that Manin had previously worked a weekend with the same partner when his three year old son was at the office. *See* Pl's. Aff.Ex. N. The corporate department refused her request to return part-time from maternity leave. In her evaluations, Managing Partner Abramowitz wrote, somewhat ambiguously, "not good, pregnant." According to plaintiff's affidavit, Manin was eventually laid off before her expected return from maternity leave in March of 1992. Defendant claims that Manin, due to difficulties in balancing her family and work life, requested to be laid off. *See* Babson Aff.Ex. W.

### C. *Reduction in the Workforce at Parker Chapin*

During much of the period in which the alleged discriminatory activities occurred, the number of lawyers employed by defendant was declining. On February 1, 1991, defendant employed 116 lawyers. By December 1, 1992, six months after plaintiff's termination, defendant employed 87 attorneys. This firmwide "reduction in force," *see* Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment ("Def.'s Mem.") at 6, affected the corporate department. While plaintiff and defendant contest the exact numbers and dates, it is clear that the percentage of female associates in the corporate department was shrinking during this period. As of March 1991, there were approximately eleven male corporate associates and twelve female corporate associates. By the time of plaintiff's termination, there were approximately twelve male corporate associates, and six female corporate associates. *See* Defendant's Counter Rule 3(g) Statement ¶¶ 7, 8. Defendant shows that most of the women left the firm's department based on voluntary resignations, but plaintiff, as

---

billed 174.50 hours. Plaintiff billed 97.25 hours. In July of 1992, Portnoy billed 404.50 hours, and

Timothy Kahler, Esq. billed 309.50, while plaintiff billed 106 hours.

noted above, does provide some evidence that several of these resignations may have been related to tension between female associates and defendant regarding the maternity leave policy and other issues. *See* Pl.'s Aff., at Ex.s J–P.

### D. *Defendant's Professional Evaluation of Plaintiff*

Defendant has a process by which it evaluates the professional development of its associates. Each associate is reviewed annually by their department chairman, a partner with whom they have worked closely, and a representative from the Professional Personnel Committee (the "Committee"). Several months prior to this in-person review, written evaluations prepared by partners working with the associate are discussed at a meeting of the Committee. Plaintiff's first review based on a full year's work at the firm was held in January of 1989. Plaintiff was described by the Committee's report as the "third star of the 1985 Corporate class" *see* Pl.'s Aff.Ex. H, and received the highest raise available for that year. Her next review, conducted in December of 1989, was also positive. The Committee report describing plaintiff as "very good" and recommended the highest raise. Plaintiff's next review, conducted in early January of 1991, was her last before she announced her pregnancy. The Committee report said the following: "High. Hours low. Needs to be spoken to re: attitude. Gets job done and well (*when* feels it is meaningful); aggressive. (# 2 in class)." *See* Panken Aff.Ex. R. There were three people in plaintiff's corporate class at the time. The final Committee report on the plaintiff, which was written after plaintiff left for her maternity leave, and after the alleged discrimination began, stated that plaintiff "has come down substantially in estimation over the past few years." *Id.* Ex. S. The report was much more critical of plaintiff's attitude and work ethic.[3]

### E. *Alleged Misappropriation of Documents*

After her termination, plaintiff, like other terminated employees, was provided an office and a telephone by the firm with which to conduct a job search. While in her assigned office, plaintiff noticed a file with her name on it. She opened the file, noticed documents having to do with defendant's professional evaluations of her, and then made copies of the documents. On February 25, 1993, plaintiff's original counsel in this matter wrote to defendant that plaintiff had inadvertently discovered a file containing Frank's hand-written notes regarding her professional evaluations. *See* Panken Aff.Ex. F. The letter stated that plaintiff had returned the file to defendant. *See id.* On February 26, 1993, defendant wrote to plaintiff's counsel, stating that (1) if plaintiff has any documents or other firm property, it should be immediately returned, and (2) because plaintiff had abused her job search privileges, she was no longer permitted at defendant's offices. *See id.* Ex. G. Later discovery revealed that plaintiff had made and maintained copies of evaluation information on 20 other associates as well as herself. *See id.* ¶ 18 and Ex. E. Plaintiff admits she did this, but maintains that the box holding these files was open and was not marked confidential. *See* Pl.'s Aff. ¶ 50.

### DISCUSSION

### I. *Plaintiff's Federal Claims*

Plaintiff alleges that defendant violated Title VII of the Civil Rights Act of 1964 (the "Act"). *See* 42 U.S.C. § 2000e–2(a)(1). Section 2000e–2(a)(1) of the Act states that it is an unlawful employment practice for an employer "to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, be-

---

**3.** The entire report reads as follows:
  Has come down substantially in estimation over the past few years. Very bright, quick; can do a lot *if* she wants to. Priorities out of order (office not top priority). "Goofs off." Will not spend time reading and learning. Works off of intuition (at her level she does not possess enough knowledge to do this). Ru-

mors that she had said "why come back part-time when you can work full-time and leave at 5:00 p.m., vacation, etc.;" when spoken to, she denied this. Attitude problem, with which she has poisoned others. She has been spoken to about this in the past.
Panken Aff.Ex. S. (emphasis in original).

cause of such individual's … sex." 42 U.S.C. § 2000e–2(a)(1). A 1978 amendment to the Act clarified that "because of sex" includes "because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or other related medical conditions shall be treated the same for all employment related purposes." 42 U.S.C. § 2000e(k).

Plaintiff's other federal claim is for violation of the Equal Pay Act of 1963 (the "EPA"). *See* 29 U.S.C. § 201 *et seq.* The EPA prohibits employers from paying employees of one sex at a rate different than employees of another sex for work requiring equal skill, effort, and responsibility, unless certain conditions are met. *See* 29 U.S.C. § 206(d).

## A. *Jurisdiction*

■ As a threshold objection, defendant asserts that this Court lacks jurisdiction over plaintiff's Title VII harassment and wage disparity claims because these claims were not contained in plaintiff's EEOC charge. *See* Panken Aff.Ex. A. "A district court only has jurisdiction to hear Title VII claims that are either included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. New York Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993). *See Stewart v. United States Immigration & Naturalization Service,* 762 F.2d 193, 198 (2d Cir.1985); *Brown v. City of New York,* 869 F.Supp. 158, 169 (S.D.N.Y.1994). Claims not alleged in the EEOC charge have been found to be "reasonably related" if the conduct complained of would fall within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts,* 990 F.2d at 1402 (quoting *Smith v. American President Lines, Ltd.,* 571 F.2d 102, 107 n. 10 (2d Cir.1978)).[4]

Plaintiff's EEOC charge focuses on her allegedly discriminatory termination. *See* Panken Aff.Ex. A. But, in the EEOC charge, like in her complaint filed in this Court, plaintiff details the allegedly harassing conduct which led up to this termination. Included are the breakfast meeting during her maternity leave and her feeling of being isolated by the firm after her return from maternity leave. Based upon these facts, the Court does have jurisdiction to hear plaintiff's Title VII harassment claim because it is "reasonably related" to her EEOC charge.

■ Plaintiff does not argue in her EEOC charge that part of this discriminatory treatment included a disparity in her salary compared to similarly experienced male associates. Therefore, because this claim is not "reasonably related" to her EEOC charge, the Court lacks jurisdiction to hear plaintiff's Title VII wage disparity claim. Of course, the Court does have jurisdiction to hear plaintiff's Equal Pay Act claim. *See infra* Part IC.

## B. *Summary Judgment and Title VII*

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994). In assessing the record to determine whether

---

**4.** Claims have also been found to be "reasonably related" if they allege retaliation by an employer against an employee for filling an EEOC charge, *Butts,* 990 F.2d at 1402, or if they allege further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge. *Id.*

676

there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *accord Chambers,* 43 F.3d at 36. The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). The trial judge's function in response to a summary judgment motion is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir. 1994). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (emphasis in original). Unsupported allegations will not suffice to create a genuine issue of material fact; rather, there must be sufficient evidence to allow a reasonable jury to find in favor of the non-moving party. *See id.; see also Gallo,* 22 F.3d at 1224; *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992) ("[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted"); *accord Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir. 1991).

In a Title VII employment discrimination case, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *See St. Mary's Honor Ctr. v. Hicks,* — U.S. —, — – —, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995); *Chambers,* 43 F.3d at 37. In order to defeat a motion for summary judgment, the showing the plaintiff must make as to the elements of a prima facie case is "de minimis." *See, e.g., Cronin,* 46 F.3d at 196; *Chambers,* 43 F.3d at 37. Through direct, statistical, or circumstantial evidence, the plaintiff must show: (1) that she belongs to a protected class; (2) that she was performing her duties satisfactorily; (3) that she was discharged; and (4) that her discharge occurred in circumstances giving rise to an inference of discrimination based on her membership in the protected class. *See Chambers,* 43 F.3d at 37; *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991) (religious discrimination in violation of Title VII).

It is unusual to find direct evidence of an employer's intent to discriminate. Rather, most cases go forward based on circumstantial evidence. The Second Circuit has used this realization to direct trial courts to tread cautiously when considering an employer's motion for summary judgment in a discrimination case. In *Gallo,* the Court said:

> Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.

*Gallo,* 22 F.3d at 1224; *see also Chambers,* 43 F.3d at 37 ("Because an employer who discriminates is unlikely to leave a smoking gun attesting to discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence.").

The following circumstances have been considered as contributing to a permissible inference of discriminatory intent: (1) an employer's invidious comments about others in the employee's protected class, *see, e.g., Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992); (2) more favorable treatment of employees not in the protected group, *see, e.g., Washington v. Garrett,* 10 F.3d 1421, 1434 (9th Cir.1993); and (3) the sequence of events leading to the plaintiff's discharge. *See Chambers,* 43 F.3d at 37. Because this is summary judgment, the duty of the Court is not to determine which inferences should be drawn, but rather whether there is sufficient evidence which would allow a rational trier of fact to infer discriminatory intent. *See id.* at 28.

▉ If the plaintiff succeeds in presenting a prima facie case of discrimination, the defendant has the burden of producing, " 'through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment decision." *Hicks*, —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55 n. 8, 101 S.Ct. 1089, 1094–95 n. 8, 67 L.Ed.2d 207 (1981)) (emphasis in original).

▉ After the defendant has articulated such nondiscriminatory reasons, the plaintiff is given the opportunity to show that defendant's reasons were merely a pretext for discrimination. *See Chambers*, 43 F.3d at 38. The plaintiff must establish "both that the reason was false, *and* that discrimination was the real reason." *Fisher v. Vassar College*, 66 F.3d 379, 392 (2d Cir.1995) (quoting *Hicks*, —— U.S. at ——, 113 S.Ct. at 2752). Recent case law indicates that this burden is a modest one. *See Cronin*, 46 F.3d at 203 ("[U]nless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is not genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence ... and the defendant's evidence ... reflects a question of fact to be resolved by the fact finder at trial."); *see Chambers*, 43 F.3d at 38 (pretext may be demonstrated by reliance on the evidence comprising the prima facie case).

▉ A plaintiff who claims she was unlawfully terminated may prevail notwithstanding the fact that her job was eliminated as part of a reduction in workforce. *See Cronin*, 46 F.3d at 204. "Even during a legitimate reorganization or workforce reduction, an employer may not dismiss employees for unlawful discriminatory reasons." *Mar-*

esco v. Evans Chemetics, Div. of W.R. Grace & Co., 964 F.2d 106, 111 (2d Cir.1992) (quoting *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 81 (2d Cir.1983)). The fact finder can conclude defendant discriminated unlawfully if plaintiff can show that the protected group was replaced by a non-protected group in the reorganization or reduction of the workforce. *See Cronin*, 46 F.3d at 204. If the employee can show discrimination directed to her, a statistical showing by the employer that the overall reduction in force was nondiscriminatory is not, as a matter of law, dispositive. *See id.; Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 825 (2d Cir.1992).

▉ Plaintiff easily establishes the first three elements of a prima facie case.[5] She is a member of a protected class; she presented evidence that she performed her duties satisfactorily; and she was discharged. Defendant contests, however, whether plaintiff's discharge occurred under circumstances giving rise to an inference of discrimination. *See Chambers*, 43 F.3d at 37. After reviewing the evidence presented, the Court finds that plaintiff established a prima facie case by meeting her de minimis burden of showing circumstances that would allow a rational fact finder to infer that defendant had a discriminatory motive in terminating plaintiff.

First, Frank's comment that "With all these pregnant women around, I guess we should stop hiring women" would allow a fact finder to question defendant's motivation in terminating plaintiff. In addition, Abramowitz's written comment about corporate associate Manin ("not good, pregnant"), is an ambiguous and material statement, the meaning of which is surely a question for a fact finder. While the statement is not necessarily invidious, it is also not, as defendant asserts, a "gender neutral" expression. *See* Def.'s. Rep. at 23.

---

5. The Court need not consider defendant's argument that plaintiff has not met the second element of a prima facie case. Defendant raised this argument for the first time in its reply brief. Arguments may not be made for the first time in a reply brief. *See United States v. Gigante*, 39 F.3d 42, 50 n. 2 (2d Cir.1994); *NLRB v. Star Color Plate Serv., Div. of Einhorn Enterprises, Inc.*, 843 F.2d 1507, 1510 n. 3 (2d Cir.) (rejecting attempt to raise new issue in reply brief even though issue was raised in previous proceeding), *cert. denied*, 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988). Moreover, defendant only briefly mentioned this point in passing, and did not provide citation to any legal authority. *See* Defendant's Reply Memorandum in Support of Its Motion for Summary Judgment ("Def.'s Rep.") at 11.

Plaintiff's professional evaluations, while surely not perfect, appear to be at a level at least equal with many male associates who were not terminated. The only deeply critical evaluation was the one submitted after plaintiff had announced her pregnancy. The importance of this evaluation must be discounted in light of plaintiff's allegations of discrimination throughout this period.

While plaintiff does not adequately show what specific projects she was prevented from working on, the low number of hours plaintiff billed after her return from maternity leave, in comparison to the nearly 2,000 hours she billed the prior year, would allow a reasonable juror to infer that plaintiff was being isolated by defendant. In addition, defendant does not rebut plaintiff's claim that she was isolated from firm recruiting activities during her pregnancy.

Plaintiff does not allege that any gender discriminatory remarks were made at the April 2 breakfast meeting. However, this does not mean that the facts of that meeting are precluded from being circumstantial evidence of a discriminatory motive. By surprising plaintiff with a very critical review, and by mentioning how hard the two new male associates were working, defendant may well have increased plaintiff's feeling of isolation at the firm.

Plaintiff's evidence does show that the number of pregnant women and mothers, as well as the number of women in general, at least in the corporate department, who left the firm during this time period was disproportionately high. A corporate department, which was a majority of women in 1991, had twice as many men as women in 1992. At least with regard to the pregnant women and mothers, the maternity leave situations they experienced may have contributed to this phenomenon. In any event, a reasonable fact finder could infer that the decreasing number of women in the corporate department was caused by unlawful discrimination.

▆ Moving to part two of the *Hicks* burden-shifting analysis, defendant attempts to rebut plaintiff's prima facie case by showing that plaintiff's termination was not based on her gender or pregnancy, but was simply part of a reduction in force. Defendant does present evidence that the firm was downsizing during the period of time between plaintiff's announcement of her pregnancy and her termination. While defendant's corporate department did hire several associates during this time period, the total number of associates in the department was decreasing.

Even conceding that defendant experienced a legitimate reduction in force,[6] plaintiff, in establishing her prima facie case, supplied enough evidence to allow a reasonable fact finder to conclude that the reduction in force does not explain plaintiff's termination. The comment made by Frank, Abramowitz' written note, plaintiff's reduced number of billable hours upon her return from maternity leave, and the decreasing representation of women in the corporate department, are facts which make defendant's asserted justification of plaintiff's termination non-dispositive. The conflict between plaintiff's prima facie case and defendant's evidence of a reduction in force is a question of fact best resolved by the fact finder after a trial. *See Cronin*, 46 F.3d at 203. Therefore, defendant's motion for summary judgment dismissing plaintiff's Title VII discrimination claims is denied.[7]

---

6. Defendant's principle documentary evidence used to prove that all nine corporate partners voted for plaintiff's termination, and that plaintiff was therefore simply another member of its reduction in force are the illegible hand-written notes of Frank. These notes may be insufficient to meet defendant's Title VII obligation to keep records of termination decisions. *See* 29 C.F.R. § 1602.14. They also provide evidence which would allow a fact finder to conclude that the reduction in force does not explain plaintiff's termination.

7. In her opposition to defendant's motion, plaintiff, relying on the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–45, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989), also argued that because direct evidence of defendant's discriminatory motive in terminating plaintiff exists, the burden of proof shifts to the defendant to prove it would have made the same employment decision even if gender had not played a role. Because the Court finds that the *Hicks* circumstantial evidence test was met by the plaintiff, the *Price Waterhouse* direct evidence analysis is not necessary.

## C. *Plaintiff's Equal Pay Act Claim*

In order to prove violation of the EPA, *see* 29 U.S.C. § 206(d), a plaintiff must first establish a prima facie case of wage discrimination by demonstrating that: (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 525 (2d Cir.1992). If plaintiff makes out a prima facie case, the burden shifts to the employer to justify the wage difference by proving that the disparity results from: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor than sex." 29 U.S.C. § 206(d)(1); *see also Aldrich,* 963 F.2d at 524.

Having offered very little evidence to support her Equal Pay Act claim, plaintiff has not met her prima facie burden. While it is true that one male associate, Michael Weinsier, Esq. ("Weinsier"), with less experience than plaintiff received a higher salary, *see* Pl.'s Aff.Ex.W, nearly all other associates, male and female, received salaries which reflected their experience. *See id.* Ex. S. Indeed, plaintiff received a higher salary than some male associates with equal experience. *See* Abramowitz Aff. ¶¶ 15, 16. Even if Weinsier's higher salary was sufficient to establish a prima facie violation of the EPA, the defendant easily rebuts this presumption by stating that Weinsier was given a raise in order to prevent him from joining another firm. *See id.* In addition, while the only

four corporate associates to receive bonuses in 1992 were men, this does not establish a violation of the EPA. First, a bonus is a merit award, and not salary. In addition, a far greater number of associates, both male and female, did not receive a bonus in 1992. Finally, all of the four people who received bonus money in 1992 billed more hours than did plaintiff. Therefore, defendant's motion dismissing plaintiff's EPA claim is granted.

## II. *Plaintiff's Pendent State Law Claims*

In addition to her federal claims, plaintiff asserts four state law claims. The first is a discrimination claim based upon a statutory provision similar to the Title VII provision plaintiff invoked. *See* N.Y.Exec.Law § 296. Defendant, in a footnote in its moving papers, stated that the same standards for a discrimination claim under federal law also apply under New York law. *See* Def.'s Mem. at 34 n. 99. Based upon this conclusion, defendant did not independently argue for summary judgment as to plaintiff's state law discrimination claim, nor did plaintiff address the issue in her opposition papers. Therefore, because the parties did not brief the issue, and because the burden is on the movant at summary judgment, the Court denies defendant's motion with regard to the state claim.

Plaintiff's other three state law claims are for prima facie tort, intentional infliction of severe emotional distress, and negligent infliction of severe emotional distress. Defendant asks the Court to decline supplemental jurisdiction over these claims.

## A. *Jurisdiction Over Plaintiff's State Law Tort Claims* [8]

28 U.S.C. § 1367 provides:
[I]n any civil action of which the district courts have original jurisdiction, the dis-

---

8. Defendant's motion with regard to plaintiff's tort claims is ambiguous. It could be treated as either a motion to dismiss for failure to state a claim upon which relief could be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, or as a motion for summary judgment under Rule 56. Because defendant states that it is moving for summary judgment, and nowhere cites Rule 12(b)(6), the Court assumes the motion is for summary judgment. Regardless, where the parties submit materials outside of the pleadings, including affidavits, in support of a motion, the Court, so long as the parties should reasonably

recognize the possibility, may treat the motion as one for summary judgment. *See* Fed.R.Civ.Proc. 12(c); *Krijn v. Pogue Simone Real Estate Co.,* 896 F.2d 687, 689 (2d Cir.1990).

Plaintiff has cross-moved for summary judgment on defendant's first and eighth affirmative defenses. The first affirmative defense says that "The Complaint fails to state a cause of action." Panken Aff.Ex. C. In effect, this motion is either an opposition to a motion to dismiss that was never made, or a request for a declaratory judgment that plaintiff has stated a claim. Regardless, because the parties have submitted affida-

trict courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action with original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). In order for the federal and state claims to be considered part of the same case or controversy, they must derive from a common nucleus of operative facts. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Brown v. Bronx Cross County Medical Group,* 834 F.Supp. 105, 109 (S.D.N.Y. 1993). Because the operative facts underlying plaintiff's Title VII claims are identical to those underlying plaintiff's state law claims, the federal and state claims are part of the same case or controversy. The fact that the state law claims may require more proof than the federal claims is an insufficient reason for the Court to find that it lacks jurisdiction over these claims. *Brown,* 834 F.Supp. at 109.

■ This Court, in its discretion, may decline to exercise its supplemental jurisdiction. *See* 28 U.S.C. § 1367(c). However, because the Court has determined that summary judgment will not be granted as to two of plaintiff's Title VII claims, dismissal of plaintiff's state law claims on jurisdictional grounds would result in duplicative litigation over the same conduct. Therefore, the Court will exercise its supplemental jurisdiction over these claims.

### B. Plaintiff's Claims and New York's "At–Will" Rule

■ It is well-settled law in New York that "where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason." *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 300, 461 N.Y.S.2d 232, 235, 448 N.E.2d 86, 89 (1983); *see also Ingle v. Glamore Motor Sales, Inc.,* 73 N.Y.2d 183, 538 N.Y.S.2d 771, 535 N.E.2d 1311 (1989). Defendant claims that allowing the tort causes of actions in this case to survive would allow plaintiff to subvert New York's at-will rule by re-casting a wrongful discharge action as tort actions. *See Murphy,* 58 N.Y.2d at 303, 461 N.Y.S.2d at 236, 448 N.E.2d at 90.

Because the factual allegations surrounding plaintiff's tort claims are largely independent of her termination, *Murphy* does not control this situation. In *Murphy,* the plaintiff alleged that because his firing was deliberately and viciously insulting, it caused him severe emotional distress. *See id.* at 298, 461 N.Y.S.2d 232, 448 N.E.2d 86. Plaintiff's alleged tort injuries, on the other hand, "commenced well before her termination, and were, *in several important respects,* unrelated to it." *Stewart v. Jackson & Nash,* 976 F.2d 86, 88 (2d Cir.1992) (emphasis added). The tort injuries plaintiff alleges were suffered during her employment by defendant, not after her termination. While it is true that in her complaint plaintiff does mention her ultimate discharge when also complaining of defendant's discrimination against her with respect to the terms, conditions, and privileges of her employment, *see* Pl.'s Aff. Ex.A. ¶ 1, because the bulk of her tort complaints are not related to her termination, the *Murphy* rule is not violated by these pleadings. *See id.*

### C. Prima Facie Tort

■ Defendant maintains that plaintiff has not stated a claim for prima facie tort. Under New York law, there are four elements required to support a claim of prima facie tort: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful.

vits, and because the parties would reasonably recognize it as a motion for summary judgment, *see Krijen,* 896 F.2d at 689, this cross-motion on the question of whether the plaintiff has stated a claim is treated by the Court as merely an opposition to defendant's motion for summary judgment dismissing plaintiff's tort law claims.

Defendant's eighth affirmative defense states that any damages awarded plaintiff should be limited due to plaintiff's post-termination conduct. For a discussion of defendant's motion, and plaintiff's cross-motion, for summary judgment on plaintiff's post-termination conduct, *see infra* Part III.

*See Curiano v. Suozzi,* 63 N.Y.2d 113, 117, 480 N.Y.S.2d 466, 469, 469 N.E.2d 1324, 1327 (1984); *Riddell Sports, Inc. v. Brooks,* 872 F.Supp. 73 (S.D.N.Y.1995) (Leisure, J.). The first of these four elements contains an additional feature which places a heavy burden on a plaintiff trying to maintain a prima facie tort claim. "The touchstone [of prima facie tort] is 'disinterested malevolence,' meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." *Twin Lab., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990) (citing *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 332, 464 N.Y.S.2d 712, 721, 451 N.E.2d 459, 467 (1983)). Motives such as profit, self-interest, or business advantage will defeat a prima facie tort claim. *See Twin Lab,* 900 F.2d at 571. This makes a claim for prima facie tort claim in a wrongful termination case much more difficult to establish than a Title VII discrimination claim, which can be satisfied even if an employers' motives for termination are mixed. *See Price Waterhouse,* 490 U.S. at 232, 109 S.Ct. at 1781.

■■■ Plaintiff asserts in her complaint that defendant's sole motivation for engaging in discriminatory conduct was to injure her, *see* Pl.'s Aff.Ex. A, ¶ 107, but she makes no other attempt to establish this point. In addition, plaintiff incorrectly states that "disinterested malevolence" is not an aspect of prima facie tort. *See* Plaintiff's Reply Memorandum of Law in Further Support of Cross–Motion for Partial Summary Judgment Dismissing Defendant's First and Eighth Affirmative Defenses ("Pl.'s Rep.") at 14 n. 5. In the instant case, defendant has provided evidence that plaintiff's termination occurred at a time when defendant was down-sizing. While, as argued above, this does not necessarily mean that plaintiff's termination was lawful, it does allow the Court to conclude that defendant had other motives, beyond a desire to harm her, in terminating plaintiff. Therefore, plaintiff's claim of prima facie tort fails as a matter of law.

D. *Intentional Infliction of Emotional Distress*

■■■ New York has adopted the Second Restatement of Torts' definition of intentional infliction of emotional distress. The Second Restatement reads: "One who by extreme and outrageous conduct intentionally and recklessly causes severe emotional distress to another is subject to liability for such emotional distress." Restatement (Second) of Torts § 46(1) (1965); *see Howell v. New York Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). An intentional infliction of emotional distress claim has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the outrageous conduct and injury; and (iv) severe emotional distress. *See Howell,* 81 N.Y.2d at 121, 596 N.Y.S.2d at 353, 612 N.E.2d at 702.

Courts applying New York law have been extremely reluctant to find that a plaintiff has satisfied the first element of this test. *See Murphy,* 58 N.Y.2d at 303, 461 N.Y.S.2d at 232, 448 N.E.2d at 86 ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community") (internal quotation omitted); *Spence v. Maryland Casualty Co.,* 995 F.2d 1147, 1158 (2d Cir.1993) (defendant employer's continual criticisms of plaintiff and continual threats to fire plaintiff falls far short of conduct actionable as an intentional infliction of emotional distress); *Bradley v. Consol. Edison Co.,* 657 F.Supp. 197, 204–05 (1987) (employer's retaliatory harassment of employee for filing an EEOC charge insufficient as a matter of law to support a claim for intentional infliction of emotional distress because conduct must consist of more than insults, indignities, and annoyances); *cf. Waldron v. Rotzler,* 862 F.Supp. 763, 770–71 (N.D.N.Y.1994) (plaintiff who claimed that police stalked him and chased him over state lines, threatened him when he confronted inspector for searching without a warrant, and beat him when stopped for a traffic violations, found to have successfully pled intentional infliction of emotional distress). Based upon the evidence presented, the Court does not find that de-

fendant's conduct towards plaintiff, even if unlawful, was "utterly intolerable in a civilized community." *Murphy*, 58 N.Y.2d at 303, 461 N.Y.S.2d at 232, 448 N.E.2d at 86. Therefore, defendant's motion as to plaintiff's claim of intentional infliction of emotional distress is granted.

### E. Negligence

▮ Plaintiff's final claim in her complaint is for negligence. Because plaintiff does not attempt to support this claim in her opposition to defendant's summary judgment motion, the Court assumes she has abandoned this claim. Regardless, because Sections 10 and 11 of New York's Workers' Compensation Law provides the exclusive remedy for unintentional employment related injuries, plaintiff's claim must fail. *See O'Rourke v. Long*, 41 N.Y.2d 219, 391 N.Y.S.2d 553, 359 N.E.2d 1347 (1976); *Bradley*, 657 F.Supp. at 205 (plaintiff's negligence claim, asserting that defendant breached its duty by not instituting and following policies to prevent discriminatory conduct towards her, is barred by Workers Compensation Law).

### III. Damages

▮ Defendant asserts that, even if plaintiff could prove discrimination, her damages should be limited due to her misappropriation, copying, and retention of defendant's documents. Defendant contends that plaintiff's damages should be limited to $27,015.36 in back pay, and that plaintiff should be barred from recovering all other damages, including compensatory damages, punitive damages, or attorney's fees. The argument presented by defendant rests on two recent decisions, one by the United States Supreme Court, the other by the New York Court of Appeals.

In *McKennon v. Nashville Banner Publishing Co.*, —— U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), the plaintiff, during her final year of employment with the defendant, copied several confidential firm documents. Her stated motivation for doing this was an apprehension that she was about to be fired because of her age, and wanted to use the documents as "insurance" or "protection." *See id.* at ——, 115 S.Ct. at 883. This information was discovered by the defendant after the plaintiff's termination, during the discovery phase of her lawsuit which charged the defendant with violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* This conduct was grounds for lawful termination of plaintiff. The Supreme Court, in reversing a Court of Appeals decision which denied plaintiff any remedy due to her misconduct, held that after-acquired evidence of wrongdoing which would have resulted in lawful termination does not preclude recovery under the ADEA.[9] However, the Court did find that an employee's misconduct was relevant to the remedies otherwise available under the statute.[10] After stating that proper remedial relief in after-acquired evidence cases must be worked out on a case by case basis, the Court stated "as a general rule" that neither reinstatement nor front pay is an appropriate remedy. *See McKennon*, —— U.S. at ——, 115 S.Ct. at 886. In addition, the Court held that back-pay should be limited to salary lost from the date of the unlawful discharge until the date the employer discovered the information which would have led to discharge on lawful grounds. *Id.*

The *McKennon* decision is premised on the employee's misconduct occurring during her employment. Because, in this case, plaintiff's alleged misconduct occurred after her termination, *McKennon* does not govern. Considering that the goal of Title VII is to eliminate discrimination in the workplace, this conclusion is appropriate and necessary. The *McKennon* court took "due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from

---

**9.** Because the substantive, antidiscrimination provisions of the ADEA are modeled upon the provision of Title VII, *see Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985), the *McKennon* analysis is applicable to the instant Title VII case.

*See, e.g., Manard v. Fort Howard Corp.*, 47 F.3d 1067 (10th Cir.1995).

**10.** The damages statute governing the ADEA, 29 U.S.C. § 626(b), is substantively similar to 42 U.S.C. § 2000e–5(g), which governs Title VII.

the employee's wrongdoing," *id.*, because of certain rights which employers have with respect to their employees. In the instant situation, defendant and plaintiff were not in an employer-employee relationship at the time of the alleged incident. Therefore any complaint defendant has against plaintiff for her post-employment conduct falls outside of the *McKennon* rule, and outside of Title VII.

■ Even if *McKennon* governed the instant situation, which it does not, liability would still not be limited to a reduced measure of back-pay. The damages provision of Title VII provide remedies beyond reinstatement, front pay, and back pay. *See* 42 U.S.C. § 2000e–5(g). These provisions state that a Court, beyond offering an employee these remedies, may "provide other equitable relief as the court deems appropriate." *Id.; see McKennon*, at ——, 115 S.Ct. at 886. Attorney's fees are also available under Title VII. 42 U.S.C. § 2000e–5(k). In addition, the Civil Rights Act of 1991 authorizes compensatory damages and punitive damages as a supplement to the damage provision provided by 42 U.S.C. § 2000e–5(g). *See* 42 U.S.C. § 1981a(b). Indeed, after the Civil Rights Act of 1991, the EEOC enforcement guidelines began to endorse the application of compensatory and punitive damages in after-acquired evidence cases. *See* Samuel A. Mills, Note, *Towards an Equitable After-Acquired Evidence Rule*, 94 Colum.L.Rev. 1525, 1551 (1994).

Defendant also argues that this Court should limit damages based upon the holding in *Lipin v. Bender*, 84 N.Y.2d 562, 620 N.Y.S.2d 744, 644 N.E.2d 1300 (1994). In *Lipin*, the plaintiff in a sexual discrimination suit removed defendant's attorneys' documents from their bags at a discovery conference. The documents were clearly privileged attorney work product relating to the litigation. *See id.* at 570, 620 N.Y.S.2d 744, 644 N.E.2d 1300. Plaintiff was requested, first by defense counsel, and then by the Court, to return the documents. Plaintiff refused defense counsel's request, and made a personal hand copy before returning the documents upon the court's request. Because the knowledge obtained from the documents by plaintiff and her counsel could not be purged, thus irreparably prejudicing defendant's ability to conduct a defense, the Court of Appeals held that the trial court properly exercised its discretion in granting defendant's motion to dismiss the action. *See id.* at 572, 620 N.Y.S.2d 744, 644 N.E.2d 1300.

This case is clearly distinguishable from *Lipin*. The file did have plaintiff's name on it, and she was authorized to be in the space from which she took the files. The documents were not privileged attorney work product, but rather materials available through discovery. Therefore, defendant was in no way prejudiced by plaintiff's conduct. While the Court certainly finds plaintiff's judgment in this situation to be questionable, dismissal of this action, or in the alternative, limitation of damages to the requested amount, is not an appropriate response.

### *CONCLUSION*

For the reasons stated above, defendant's motion for summary judgment is granted in part and denied in part. Defendant's summary judgment motion with respect to plaintiff's: (1) Equal Pay Act Claims; (2) Title VII wage disparity claim; (3) prima facie tort claim; (4) intentional infliction of emotional distress claim; and (5) negligence claim is GRANTED.

Defendant's summary judgment motion with respect to plaintiff's Title VII discrimination and harassment claims, and with respect to plaintiff's discrimination claim under New York Human Rights Law § 296, is DENIED. In addition, defendant's summary judgment motion to limit potential damages based upon plaintiff's post-termination conduct is DENIED.

Plaintiff's cross motion for summary judgment dismissing defendant's first affirmative defense is DENIED. Plaintiff's cross-motion regarding defendant's eighth affirmative defense is GRANTED.

**SO ORDERED.**