Johnetta N. MURRAY, Plaintiff,

v.

The BOARD OF EDUCATION OF the CITY OF NEW YORK, Carmen Russo, Leonard Wolff, and Martin Weisel, Defendants.

No. 91 CIV. 6950(PKL).

United States District Court, S.D. New York.

Nov. 5, 1997.

Cahill Gordon & Reindel, Peter M. Spett, of counsel, New York, NY, for Plaintiff.

Paul A. Crotty, Corporation Counsel of the City of New York, Jay Douglas Dean, of counsel, New York, NY, for Defendants.

### OPINION AND ORDER

LEISURE, District Judge.

Plaintiff Johnetta Murray, a black Hispanic woman, brought this suit against the Board of Education of the City of New York ("the Board"), as well as Carmen Russo, Leonard Wolff and Martin Weisel (hereinafter, with the Board, "defendants"), claiming that defendants discriminated against her on the basis of her race, gender, and national origin. Plaintiff specifically complains of violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1983 ("§ 1981" and "§ 1983", respectively). Defendants move for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated in this Opinion, the motion is granted in part and denied in part.

### BACKGROUND

Plaintiff is a black Hispanic woman who began working for the Board in 1980 as a teacher. *See* Plaintiff's Statement Pursuant to Local Rule 3(g) ("Pl.3(g)") at ¶¶ 1, 41. In September of 1988, plaintiff accepted an assignment from the Office of the Superintendent of the Bronx High Schools of the Board ("Bronx Superintendent's Office") to serve as Interim Acting Supervisor of Special Education ("Acting Supervisor") at Alfred E. Smith High School ("Smith High"). *See* Pl.3(g) at ¶ 2. In this position, plaintiff was responsible for the duties of an Assistant Principal of Special Education. *See* Defendants' Local Rule 3(g) Statement ("Def.3(g)") at ¶ 7.[1]

As of September 26, 1989, plaintiff was reassigned to Smith High two days per week, to the Bronx Superintendent's Office two days per week, and to Bronx High

School of Science ("Bronx Science") one day per week. *See* Def.3(g) at ¶ 6. Then, on November 16, 1989, plaintiff was transferred from Smith High to the Bronx Superintendent's Office, spending four days each week at the Superintendent's Office and continuing once each week at Bronx Science. *See id.* at ¶ 9. On February 2, 1990, she received a letter from defendant Wolff purporting to reassign her to James Monroe High School as a special education teacher. *See* Letter dated February 2, 1990, annexed as Exhibit 13 to Affidavit of Peter M. Spett In Opposition to Defendants' Motion for Partial Summary Judgment ("Spett Aff.").

On October 11, 1988, the Board advertised to fill the permanent position of Assistant Principal ("AP"), Special Education, at Smith High. *See* Def.3(g) at ¶ 4. The Board's practices and procedures for the appointment of supervisory personnel (including APs) in the New York City public high schools are set forth in Special Circular 30–R and High School Memorandum # 88R ("30R" and "88R", respectively.) *See* Def.3(g) at ¶ 11. Pursuant to these regulations, candidates first face a "Level I" screening committee that narrows a field of ten or more to at least three finalists. *See* Special Circular 30–R at ¶ 11, annexed as Exhibit L to Spett Aff. "Level II" follows, with three or more finalists interviewed by a Chancellor's Committee that is supposed to include only personnel approved by the Chancellor. *See id.*

On November 27, 1989, plaintiff applied for the vacant AP–Special Education position at Smith High. *See* Def.3(g) at ¶ 13. On December 15, 1988, the Level I screening committee interviewed eleven candidates, including plaintiff, but her name was not among the five forwarded to the Chancellor's Committee for Level II consideration. *See id.* at ¶¶ 14, 17. Plaintiff challenged the Level I findings three days later in a letter to defendant Russo, who served as Superintendent of Bronx High Schools. *See id.* at ¶ 18. Plaintiff complained of bias on the part of the screening committee as well as procedural

---

**1.** It is unclear whether Murray actually received the title of Acting Assistant Principal. While the Court refers to her as "Acting Supervisor", this Opinion need not and does not attempt to decide whether she officially served as Acting Assistant Principal as well.

irregularities. *See* Letter dated December 18, 1989, annexed as Exhibit Q to Spett Aff. Nonetheless, a Level II committee interviewed the five remaining candidates on January 23, 1990, with Ms. Maria Reekstin receiving the highest ratings from all on the committee. *See* Def.3(g) at ¶ 20.[2]

Chancellor Joseph Fernandez voided the initial Level II results and ordered a new Level II committee to convene to consider the relative merits of all eleven of the original candidates, including plaintiff. *See* Pl.3(g) at ¶ 21; *see also* Memorandum dated February 27, 1990, annexed as Exhibit S ("Ex.S") to Spett Aff. The new round of Level II interviews took place on February 6, 1990, with the new committee again strongly recommending Reekstin's hiring. *See* Def.3(g) at ¶ 24; *see also* Ex. S to Spett Aff. On March 7, 1990, Russo notified Reekstin of her appointment as AP–Special Education at Smith High. *See* Def.3(g) at ¶ 30.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about September 5, 1990. *See id.* at ¶ 31. Plaintiff was represented by counsel at the time of the filing. *See id.* at ¶ 32. Her Charge alleged that her employer, the Board, had demoted her and denied her equal terms and conditions of employment on the basis of her race, gender, color, and national origin, in violation of Title VII. *See* EEOC Charge of Discrimination, annexed as Exhibit A ("Ex.A") to Declaration of Jay Douglas Dean in Support of Motion For Summary Judgment ("Dean Decl."). Murray complained specifically of her involuntary reassignment to the Bronx Superintendent's Office, and alleged that "Respondent's action denied me future promotional opportunities." *Id.* She answered "11–16–89" in the space requesting the "Date Most Recent or Continuing Discrimination

Took Place." *Id.* In a letter to the EEOC that addressed Murray's allegations, the Board discussed the hiring of an AP–Special Education for Smith High and attached a copy of the 30R. *See* Letter to EEOC Investigator dated November 19, 1990, at 6, annexed as Exhibit 17 to Spett Aff. A later letter from the Board to the Investigator, apparently responding to his written questions, noted that Reekstin was selected to fill the AP–Special Education position. *See* Letter to EEOC Investigator dated December 21, 1990, annexed as Exhibit 51 to Spett Aff.

■ On February 7, 1991, EEOC District Director Spencer Lewis issued a Determination stating that "the evidence obtained during the investigation [of Murray's Charge] does not establish a violation of the statute." EEOC Determination, annexed as Exhibit 52 to Spett Aff. The Determination discussed and denied the merit of Murray's allegations of discrimination in her transfer from Smith High; however, it made no mention of the failure to promote Murray to AP–Special Education. *See id.* The Determinations Review Program reviewed and upheld the Determination, thereby dismissing the Charge. *See* Determination on Review and Dismissal of Title VII Charge, dated July 8, 1991, annexed as Exhibit B to Dean Decl.[3]

Plaintiff filed *pro se* a Complaint on September 18, 1991, commencing the instant action. Aided by counsel, she filed an Amended Complaint on August 17, 1994, invoking the Court's jurisdiction under Title VII, § 1981, and 28 U.S.C. §§ 1331, 1343. Defendants now move for partial summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

The moving party is entitled to summary judgment only if the Court determines that

---

2. Ms. Reekstin is a black woman. *See* Def.3(g) at ¶ 29.

3. Defendants assert that in light of the EEOC Determination, they are entitled to partial summary judgment based on principles of administrative estoppel. *See* Defendants' Memorandum of Law ("Def.Mem.") at 14–15. Had they undertaken even a cursory review of controlling precedent, defendants would have discovered that this argument is without merit; a negative Determi-

nation by the EEOC does not estop a federal court from making a *de novo* review of the claims underlying the Determination. *See Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 470 n. 7, 102 S.Ct. 1883, 1892 n. 7, 72 L.Ed.2d 262 (1982) ("[I]t is settled that decisions by the EEOC do not preclude a trial *de novo* in federal court."); *see also Mohasco Corp. v. Silver*, 447 U.S. 807, 811, 100 S.Ct. 2486, 2489–90, 65 L.Ed.2d 532 (1980).

there exists no genuine issue of material fact and that based on the undisputed facts, the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 128 (2d Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *see also Tomka*, 66 F.3d at 1304. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995) (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53); *see also Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1231 (2d Cir.1996). The Court's function on a motion for summary judgment is not to try issues of fact, but rather to determine whether there exists a genuine issue of material fact to be tried. *See Sutera v. Schering Corp.*, 73 F.3d 13, 15–16 (2d Cir. 1995).

In determining whether there exists a genuine issue of material fact, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *see also Holt*, 95 F.3d at 129. The Court should be "especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996); *see also Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F.Supp. 667, 676 (S.D.N.Y.1995).

## II. Plaintiff's Title VII Claims

### A. *Subject Matter Jurisdiction*

■ A District Court only has subject matter jurisdiction over Title VII claims that were raised in an EEOC charge "or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. City of New York Dep't of Hous. Preservation & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993) (citing *Stewart v. United States Immigration & Naturalization Serv.*, 762 F.2d 193, 198 (2d Cir.1985); *Almendral v. New York State Office of Mental Health*, 743 F.2d 963, 967 (2d Cir.1984); *Goodman v. Heublein, Inc.*, 645 F.2d 127, 131 (2d Cir.1981); *Kirkland v. Buffalo Bd. of Educ.*, 622 F.2d 1066, 1068 (2d Cir.1980)); *see also Cornwell v. Robinson*, 23 F.3d 694, 706 (2d Cir.1994) ("[T]he plaintiff may raise any claim that is 'reasonably related' to those asserted in the EEOC filing, even if that claim was not expressly addressed by EEOC.")

Before pursuing Title VII claims in a District Court, plaintiffs must exhaust administrative remedies by raising the claims in an EEOC charge. The Court of Appeals for the Second Circuit has explained:

> [T]he exhaustion requirement is an essential element of Title VII's statutory scheme .... [T]he purpose of the notice provision, which is to encourage settlement of discrimination disputes through conciliation and voluntary compliance, would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC.

*Butts*, 990 F.2d at 1401 (internal citations omitted).

Generally, then, a District Court can only hear plaintiffs' Title VII claims that have been raised previously in an EEOC charge.

The Second Circuit also has recognized three situations where a District Court may consider claims not raised explicitly in an EEOC charge. *See Butts*, 990 F.2d at 1402. The first situation occurs when the conduct underlying the previously-unraised claim would fall within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* (quoting *Smith v. American President Lines, Ltd.*, 571 F.2d 102, 107 n. 10 (2d Cir.1978)) (internal citations omitted).

Courts have described this situation as a "loose pleading" standard. *See, e.g., Minetos v. City University of New York*, 875 F.Supp. 1046, 1053 (S.D.N.Y.1995); *Clements v. St. Vincent's Hospital*, 919 F.Supp. 161, 165 (S.D.N.Y.1996). The second situation occurs when the claim not raised in the EEOC charge alleges retaliation by an employer against an employee for filing an EEOC charge. *See Butts*, 990 F.2d at 1402 (citing *Malarkey v. Texaco, Inc.*, 983 F.2d 1204 (2d Cir.1993); *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 410–11 (2d Cir.1991); *Goodman*, 645 F.2d at 131; *Kirkland*, 622 F.2d at 1068). The third situation occurs when a plaintiff's previously-unraised claim is predicated on additional "incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Butts*, 990 F.2d at 1403 (citing *Almendral*, 743 F.2d at 967). Neither the second nor third situation is relevant to the instant case.

■ The Court can exercise jurisdiction over plaintiff's Title VII claims in the instant case, even insofar as they relate to her allegations that defendants discriminated against her in hiring an AP–Special Education for Smith High. Murray's EEOC Charge states in full:

I was hired as a classroom teacher in September, 1980, and had been promoted into responsible positions during the course of my career. In 1988 I became Assistant Principal. On November 16, 1989, I was involuntarily assigned at the Superintendent's office because I was accused of insubordination and having poor performance. I deny the accusation. On the other hand, Caucasian non-Hispanic males who had been insubordinate were not functionally demoted as I have been. Respondent's action denied me future promotional opportunities.

I believe that I have been demoted and denied equal terms and conditions of employment because of my race (Black), national origin (Hispanic) and sex (female), in violation of Title VII of the Civil Rights Act of 1964, as amended.

Ex. A to Dean Decl.

As noted earlier, the Charge is dated September 5, 1990, lists November 16, 1989, as the date the most recent discrimination had taken place, and was prepared by Murray with the assistance of counsel. *See supra* 174.

While the Charge focuses on Murray's involuntary reassignment from Smith High to the Bronx Superintendent's Office, the Charge also mentions that she has been denied promotional opportunities. Nonetheless, this statement alone cannot satisfy the exhaustion requirement and vest subject matter jurisdiction over the "failure to promote" claim in this Court. In finding a lack of subject matter jurisdiction over a Title VII claim by a plaintiff who had asserted in her EEOC charge that she had been "denied promotional opportunities and consideration based on my race and sex," the Second Circuit cautioned:

Were we to permit such vague, general allegations, quite incapable of inviting a meaningful EEOC response, to define the scope of the EEOC investigation and thereby predicate subsequent claims in the federal lawsuit, such allegations would become routine boilerplate and Title VII's investigatory and mediation goals would be defeated.

*Butts*, 990 F.2d at 1403.

The mere mention in her Charge that Murray had been denied promotional opportunities thus is insufficient to satisfy the exhaustion requirement.

■ In allowing District Courts to hear a Title VII claim concerning an allegation that was not made in an EEOC charge, but instead is reasonably related to the charge, the Second Circuit has emphasized that the Court must look "not merely to the four corners of the often inarticulately framed charge, but [also must] take into account the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gomes v. Avco Corp.*, 964 F.2d 1330, 1334 (2d Cir.1992) (citing *Silver v. Mohasco Corp.*, 602 F.2d 1083, 1090 (2d Cir.1979), *rev'd on other grounds*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980)). The most common justification for allowing "loose pleading" is that EEOC charges usually are completed without the

benefit of counsel, and the primary purpose of the charge is to alert the EEOC to the discrimination of which the charging party complains. *See Minetos,* 875 F.Supp. at 1052. However, the Second Circuit never has made the application of the loose pleading standard contingent on an EEOC charge actually having been filed *pro se.* Murray thus receives the benefit of loose pleading despite having been assisted by counsel in preparing and filing her EEOC Charge.

Murray's allegation of discrimination in her transfer from Smith High dominates her EEOC Charge. However, her Title VII claim in the instant case alleging discrimination in the failure to promote her to AP–Special Education arises out of the same nucleus of operative fact as does the involuntary transfer claim. At their roots, her involuntary transfer and failure to promote claims both stem from what she perceived as a discriminatory vendetta against her by certain of her superiors employed by the Board. Plaintiff alludes to the alleged vendetta in the Charge when she acknowledges but denies accusations of poor performance and insubordination, complaining of disparate treatment. *See* Ex. A to Dean Decl. These accusations were chronicled in a series of letters of admonishment placed in Murray's personnel file. *See* Letters of June 22, 1989, September 21, 1989, and September 25, 1989, annexed as Exhibit I to Dean Decl. Defendants claim that these letters evidence Murray's professional shortcomings, *see* Def. Mem. at 2, while plaintiff asserts that they are proof of a concerted discriminatory effort perpetuated by defendant Weisel and sanctioned by the other defendants in order to "get rid" of Murray by destroying her professional reputation. *See* Plaintiff's Memorandum of Law in Opposition ("Pl.Opp.") at 3–4.

There exists a genuine issue of material fact as to which side's version of the dispute just described is accurate; at this stage of the proceedings, the Court should not pass judgment on this issue. What remains unmistakable is that the alleged discrimination involved in Murray's involuntary transfer is intimately related to the alleged discrimination that might have impeded her application for the AP job. In some ways, the link could be direct: the allegedly discriminatory reprimands that Murray received might have been considered by the committees that reviewed her application, and perhaps influenced their decisions. Moreover, the alleged discriminatory vendetta might have succeeded more generally in tarnishing her professional reputation in the eyes of those who might only have heard of Murray in connection with her trouble at Smith High. Given these links, an EEOC investigation of the allegations set forth in Murray's Charge likely would reach the events surrounding the subsequent decision to promote Reekstin to AP. The overlap between the relevant facts and events underlying the two claims is too substantial for the Court to reach any other conclusion.

Ultimately, the EEOC investigation of Murray's Charge did touch upon the hiring of a new AP–Special Education for Smith High. As noted in the Background section of this Opinion, the Board described the hiring process in some detail in a response letter to the EEOC Investigator, and the Investigator apparently also asked a question and received an answer about who was hired for the job. *See supra* 174. While not definitive, these occurrences are probative of the fact that the "failure to promote" claim is reasonably related to the allegations contained in Murray's Charge.

In light of the evidence and precedent noted *supra,* the Court finds that plaintiff's "failure to promote" claim was reasonably related to the allegations of her Charge and could have been expected to be covered by the EEOC investigation growing out of her Charge. *See, e.g., Peterson v. Insurance Co. of North America,* 884 F.Supp. 107 (S.D.N.Y. 1995) (jurisdiction proper over failure to promote claim where EEOC charge pleaded only constructive discharge); *Bridges v. Eastman Kodak Co.,* 822 F.Supp. 1020 (jurisdiction over a claim of *quid pro quo* harassment where charge asserted only hostile environment harassment); *Sigmon,* 901 F.Supp. 667 (jurisdiction over harassment claim where charge asserts only discriminatory discharge); *Rivera v. Puerto Rican Home Attendants Services,* 930 F.Supp. 124

(S.D.N.Y.1996) (jurisdiction over sexual touching claim where charge asserted sexual harassment). Murray therefore exhausted her administrative remedies, and the Court has jurisdiction over all of her Title VII claims.

### B. *Legal Standard*

The Court analyzes a Title VII claim of discrimination under the familiar three-part burden shifting test enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and developed in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See Tomka,* 66 F.3d at 1308. First, a plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *see also Holt,* 95 F.3d at 129. The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the alleged mistreatment. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Finally, if the defendant satisfies this burden, the plaintiff has the ultimate burden of proving that the defendant's proffered reason served merely as a pretext for discrimination. *See Hicks,* 509 U.S. at 515, 113 S.Ct. at 2751–52; *see also Holt,* 95 F.3d at 129.

### 1. *Failure to Promote*

■ To establish a *prima facie* case of hiring discrimination under Title VII, plaintiff must demonstrate that (i) she is a member of a protected class; (ii) she applied and was qualified for a job for which the employer was seeking applicants; (iii) despite her qualifications, she was rejected; and (iv) after her rejection, the position remained open and her employer continued to seek applicants from persons of plaintiff's qualifications. *See O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 308, 116 S.Ct. 1307, 1308, 134 L.Ed.2d 433 (1996) (citing

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824). Meeting this burden "is not onerous." *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94) (internal quotation marks omitted); *see Donato v. Plainview–Old Bethpage Cent. School Dist.,* 96 F.3d 623, 634 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997) ("At this stage, plaintiff's burden is *de minimis.*")

■ Plaintiff has established a *prima facie* case with regard to her claim under Title VII for failure to promote her to AP–Special Education. As described in the Background section, she is a black Hispanic woman who applied for the job, had served in an interim capacity in the position, and was rejected in favor of another applicant. In light of the Supreme Court's decision in *O'Connor,* it is immaterial that the person hired also was a black woman. In *O'Connor,* the Court stated, "The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his [protected status]." [4] *O'Connor,* 517 U.S. at ——, 116 S.Ct. at 1310. With regard to her failure to promote claim, then, plaintiff has made the *prima facie* showing required by *McDonnell Douglas.*

■ Plaintiff has demonstrated that she may be able to meet her burden under *McDonnell Douglas* at trial; her claim for failure to promote should proceed. As noted *supra,* she has stated a *prima facie* case of discriminatory hiring. Moreover, she has attempted to demonstrate that defendants' declared reasons for not hiring her (*i.e.,* plaintiff's history of alleged insubordination and poor performance) are pretextual. She has presented evidence that defendant Weisel referred to her as a "mixed breed", vowed to "get rid of" her, and acted in a similarly vindictive and discriminatory manner towards another Hispanic teacher in Murray's department. *See* Pl.3(g) at ¶¶ 46–47. While

---

**4.** While *O'Connor* concerned a plaintiff suing under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.,* the Court explicitly applied the Title VII *prima facie* standard to the ADEA action. *See O'Connor,* 517 U.S. at 309–11, 116 S.Ct. at 1309–10. It follows that *O'Connor* applies in the instant case, a Title VII employment discrimination claim. *See Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158–59 (7th Cir.1996).

the Court of course offers no opinion as to the merit of her contentions, the Court must find that plaintiff has offered evidence sufficient to demonstrate the existence of a genuine issue of material fact as to the true reason for the failure to promote Murray to AP–Special Education. Therefore, plaintiff can proceed to trial with the claim.[5]

### 2. Constructive Discharge

■While defendants do not challenge plaintiff's Title VII "wrongful transfer" claim, they move for summary judgment on her claim for constructive discharge. The Second Circuit has stated:

> [A] claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

*Stetson v. NYNEX Service Co.,* 995 F.2d 355, 361 (2d Cir.1993) (internal citations omitted).

■ In the instant case, plaintiff remains employed by the Board. *See* Def.3(g) at ¶ 39. . Following *Stetson,* her claim for constructive discharge is insufficient as a matter of law.[6] *See Minetos v. City University of New York,* 925 F.Supp. 177, 186 (S.D.N.Y. 1996). The Court must grant defendants' motion for summary judgment as to plaintiff's Title VII claim for constructive discharge.[7]

---

**5.** The criteria developed in *McDonnell Douglas* apply not only to Title VII cases, but to employment discrimination cases under §§ 1981 and 1983 as well. *See Sorlucco v. New York City Police Dep't,* 888 F.2d 4, 6–7 (2d Cir.1989); *see also Hicks,* 509 U.S. at 506 n. 1, 113 S.Ct. at 2747 n. 1 (1993). Therefore, the Court's analysis *supra* is equally applicable to plaintiff's claims under §§ 1981 and 1983; she can proceed with them except as indicated in this Opinion.

**6.** The same standard of constructive discharge applies to plaintiff's claims under §§ 1981 and 1983. *See Minetos,* 875 F.Supp. at 1052. Therefore, to the extent her claims under §§ 1981 and 1983 are for constructive discharge, they too are insufficient and must be dismissed.

### 3. Individual Defendants

■ The Court also must dismiss plaintiff's claims under Title VII against the individual defendants. The Second Circuit has made it clear that there is no individual liability for violations of Title VII:

> Title VII's remedial provisions also lead us to conclude that Congress never intended to hold agents individually liable for violations of the Act .... [I]t appears that Congress contemplated that only employer-entities could be held liable for compensatory and punitive damages ....

*Tomka,* 66 F.3d at 1314–15.

Therefore, the Court must grant the individual defendants' motions for summary judgment on the Title VII claims against them. *See, e.g., Cerrato v. Durham,* 941 F.Supp. 388, 395 (S.D.N.Y.1996); *Holmes v. NBC/GE,* 925 F.Supp. 198, 200 n. 6 (S.D.N.Y.1996); *Storr v. Anderson School,* 919 F.Supp. 144, 148 (S.D.N.Y.1996); *Campbell v. Grayline Air Shuttle, Inc.,* 930 F.Supp. 794, 800 (E.D.N.Y.1996).

## III. Section 1983 Claims

### A. Timeliness

■ The Court considers plaintiff's claims under § 1983 timely filed. In her original Complaint, filed *pro se* on September 18, 1991, plaintiff alleged violations of Title VII and § 1981. *See* Complaint at 1, 4. In her Amended Complaint, filed with the aid of counsel on August 17, 1994, plaintiff added a § 1983 claim for deprivation of her constitutionally-protected rights to due process and

---

**7.** In her papers, plaintiff attempts to recharacterize her constructive discharge claim. *See* Pl. Opp. at 16–17. To the extent that Murray's transfer caused a change in her employment status, the claim survives via the uncontested "wrongful transfer" element of her Title VII action. In her Amended Complaint, however, plaintiff clearly alleges "constructive discharge". Amended Complaint at 2. In this area of the law, "constructive discharge" is a term of art with a precise meaning, and a claim under Title VII for constructive discharge must satisfy the standard set forth *supra*. Plaintiff has failed to demonstrate that she might satisfy that standard at trial.

equal protection. *See* Amended Complaint at 16–17.

Under the Federal Rules of Civil Procedure:

An amendment of a pleading relates back to the date of the original pleading when . . . (2) the claim or defense arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . . .

Fed.R.Civ.P. 15.

The § 1983 claim stated in the Amended Complaint arises out of the same conduct complained of in plaintiff's original Complaint. Plaintiff originally complained of a failure to promote her, the creation of "a paper trail of false accusations" by Weisel and "his peers" that forced her out of Smith High, and generally of discrimination by defendants on the basis of her race, color, gender, and national origin. *See* Complaint at 3, 3a. Plaintiff's § 1983 claim arises out of the same alleged conduct, meaning that the defendants had adequate notice in 1991 that the conduct underlying the § 1983 claim would be at issue in this litigation. Therefore, plaintiff's § 1983 claim relates back to the original Complaint and is considered filed on September 18, 1991. *See Encoder Communications, Inc. v. Telegen, Inc.*, 654 F.2d 198, 203 n. 2 (2d Cir.1981) (citing 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1497 (1971)).

▮▮▮ "In section 1983 actions, the applicable limitations period is found in the 'general or residual [state] statute [of limitations] for personal injury actions.'" *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir.1997) (quoting *Owens v. Okure*, 488 U.S. 235, 251, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989)) (bracketed material in *Ormiston* ). "For § 1983 actions arising in New York, the statute of limitations is three years." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir.1994); *see*

*also Ormiston,* 117 F.3d at 71. In the instant case, the events at issue occurred in 1989–90 and Murray filed the Complaint in 1991. As plaintiff's § 1983 claim relates back to her original Complaint, plaintiff timely filed her § 1983 claim.[8]

### B. *Municipal Liability*

▮▮▮ Section 1983 imposes liability where persons acting under color of state law subject a complainant to the deprivation of a right or rights secured by the Constitution or federal law. *See Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060 (2d Cir.1989). Plaintiff cannot prevail on her claims against the Board under § 1983. For a municipal defendant to be liable under § 1983, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) (internal citations omitted). Plaintiff has not attempted to prove the existence of an explicit Board policy or custom of discrimination. However, "[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials." *Id.* Municipal liability even may be predicated on the single decision of one who possesses final authority to establish municipal policy with respect to the action ordered. *See Pembaur v. Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986).

▮▮▮ "The question of whether a particular official has final policymaking authority is not for the jury to decide, but is a question of state law to be determined by the Court." *Pohl v. Green,* 1991 WL 274483 (S.D.N.Y.) (citing *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). The Supreme Court has emphasized that a municipal defendant cannot be found liable under § 1983 based on

---

**8.** Plaintiff also timely filed her § 1981 claim. The original *pro se* Complaint cites § 1981, though only as a source of this Court's jurisdiction. *See* Complaint at 1. *Pro se* complaints have long been held to less stringent standards than formal pleadings drafted by lawyers, and receive a liberal construction from the courts. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); *see also Ortiz v.*

*Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). Here, defendants had adequate notice from the entire Complaint that they might be forced to contest a § 1981 claim. Moreover, even if the original Complaint had not stated sufficiently a claim under § 1981, the § 1981 claims in the Amended Complaint would relate back to the date of the original filing. Therefore, the § 1981 claims also are timely filed.

a *respondeat superior* theory. *See Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Its recent decision in *Board of County Commissioners of Bryan County, Oklahoma v. Brown,* —— U.S. ——, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), demonstrates the Court's concern over municipal defendants being unduly burdened by potential liability under § 1983. Limiting municipal liability, the Court stated:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bryan County,* —— U.S. at ——, 117 S.Ct. at 1388.

The Court went on to explain:

> To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged .... A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision ....
> [D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.

*Id.* at —— —— ——, 117 S.Ct. at 1391–92 (internal citations omitted).

 Plaintiffs suing under § 1983 thus must show that a municipal defendant displayed deliberate indifference, even where the plaintiff alleges wrongdoing by a policy-maker. In the instant case, plaintiff has not demonstrated that the Board displayed deliberate indifference to the possibility that any decision relating to plaintiff was likely to deprive her of a federally-protected right. Under *Bryan County,* then, plaintiff cannot prevail against the Board on her § 1983 claims.

 Plaintiff also fails to demonstrate that a policymaker was involved in the alleged discrimination surrounding her failure to be promoted to AP. Plaintiff attempts to demonstrate the existence of a discriminatory policy by asserting that Russo served as a policymaker for hiring and for transfer decisions concerning supervisory personnel, and that Russo's allegedly discriminatory actions relating to plaintiff therefore rise to the level of municipal policy. *See* Pl. Opp. at 17–20. This effort cannot stand in light of the relevant local laws and procedures.

As a matter of New York law, Russo was not the final decisionmaker for the selection of the new AP. The relevant statutory provision notes, "The *chancellor* shall appoint and assign *all* supervisory personnel for all schools and programs under the jurisdiction of the city board from persons on qualifying eligible lists." NYS Ed. L. § 2590–j4(b) (McKinney's 1995) (emphasis added). The procedural regulations governing the selection of Assistant Principals mandate compliance with this law, as demonstrated by the 88R: "The role of all committees is advisory only. Final responsibility in selection rests with the Chancellor." Ex. M to Dean Decl. at ¶ I(4).[9] Furthermore, while Russo was responsible only for Bronx High Schools, the 30R clearly requires the system of assignment to include "city-wide standards and procedures developed and promulgated by the Chancellor as minimum city-wide requirements ...." Ex. L to Dean Decl. at ¶ II(C). Given this evidence, the Court finds that the Chancellor, not Ms. Russo, possessed final decisionmaking authority as a

**9.** It is later noted in the 88R that in selecting Assistant Principals for Administration, "The Executive Director of the High School Division will act for the Chancellor on these assignments or appointments." Ex. M to Dean Decl. at ¶ II(G). However, in light of the language in the same 88R concerning the Chancellor's retaining final responsibility, the Court must view this delegation as a limited one. The Chancellor retains final decisionmaking authority under the 88R when viewed as a whole.

matter of New York law over the hiring of an AP for Smith High.[10] Therefore, the Board cannot be liable for Russo's actions insofar as they relate to the promotion process. *See Carrero v. New York City Housing Authority,* 890 F.2d 569 (2d Cir.1989) (holding that the Housing Authority could not be held liable for the allegedly discriminatory behavior of a Supervisor, because the Supervisor's alleged behavior was contrary to stated Housing Authority policy); *see also Davis v. City of New York,* 1990 WL 165763 (S.D.N.Y.).[11]

On the other hand, Russo might well have been a policymaker with regard to plaintiff's involuntary transfer. Under New York State law, "The community superintendent may transfer members of the teaching and supervisory service without their consent within the district ..." NYS Ed. L. § 2590–j8. Moreover, Russo claimed at her deposition that she had the ultimate responsibility for the reassignment of personnel. *See* Deposition of Carmen Russo at 445–46, annexed as Exhibit 54 to Spett Aff. However, the possibility that Russo was a policymaker for the purpose of transferring supervisory Board employees such as plaintiff is not dispositive of the issue of municipal liability under § 1983 for the alleged wrongful transfer.

■ Following *Bryan County,* a § 1983 plaintiff must demonstrate that "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's [alleged] deprivation of federal rights." —— U.S. at ——, 117 S.Ct. at 1386. In the instant case, plaintiff offers no evidence that the Board was the "moving force" behind either her transfer or her not being promoted. Indeed, in her Amended Complaint, plaintiff alleges that her transfer "was the result of *Weisel's* attacks on plaintiff's character and competence, which were motivated by a discriminatory animus." Amended Complaint at ¶ 26 (emphasis added). The municipal defendant therefore was not even alleged to have been the moving force behind plaintiff's involuntary transfer. Nor has plaintiff alleged that the Board was the moving force behind the failure to promote her to AP. The § 1983 claims against the Board, then, are insufficient as a matter of law.[12]

### C. *Individual Liability*

■ The individual defendants, on the other hand, may be held liable under § 1983 for the alleged deprivations of plaintiff's federally-protected rights. Where damages are sought from individual defendants in a § 1983 action, the individuals must have been personally involved in the alleged deprivation. *See Al–Jundi,* 885 F.2d at 1065–66. It is not enough to allege merely that a defendant occupied a position of authority. *See id.* Rather, the Second Circuit has explained:

> We have construed personal involvement for these purposes to mean direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates.

*Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir. 1996).

---

10. The facts presented to the Court in the instant case strongly support this conclusion. Discussing the process by which Reekstin was chosen as AP, Chancellor Fernandez wrote, "I ordered that a newly-constituted Level II committee be convened and that all eleven applicants for the position be interviewed by that committee .... After a careful review ... I have approved the selection of Ms. Reekstin for this position." Ex. S to Dean Decl. This statement clearly indicates that the Chancellor was the final decisionmaker concerning the hiring of a new AP for Smith High.

11. This Court's finding of no municipal liability is readily distinguishable from *Pohl.* In *Pohl,* the Court allowed municipal liability for a discriminatory failure to promote where "the active co-operation of the Board of Education and the Chancellor" was proven by the failure to conform to the relevant regulations by advertising to fill supervisory vacancies. *Pohl,* 1991 WL 274483 at 3. Here, there is no evidence of "active cooperation" by the Board or Chancellor; indeed, as noted in the Background section, it is undisputed that the AP vacancy was advertised. *See supra* 173. Finally, *Pohl* was decided prior to *Bryan County.*

12. The standard governing municipal liability under § 1981 is identical to that under § 1983. See *Jett,* 491 U.S. at 734–35, 109 S.Ct. at 2722–23. Thus, for the reasons stated *supra,* plaintiff's § 1981 claims against the Board are insufficient as a matter of law and are dismissed.

Under this standard, it is clear that all of the individual defendants were personally involved in the matters that form the crux of plaintiff's § 1983 claim. Weisel was at the center of the allegedly discriminatory actions that plaintiff claims led to her transfer. *See, e.g.,* Ex. I to Dean Decl. He also sat on the Level I panel. *See* Def.3(g) at ¶ 16. Wolff, who served as Executive Assistant to the Superintendent in charge of Special Education, was directly responsible for transferring Murray from her full-time position at Smith High. *See* Memo dated September 26, 1989, annexed as Exhibit 2 to Spett Aff. He also wrote a memo recommending plaintiff's reassignment from Smith High in which he attacked her ability and character. *See* Memo dated November 27, annexed as Exhibit 41 to Spett Aff. As Superintendent, Russo had notice of the allegation that Murray's transfer was based on discrimination, *see* Letter dated November 16, 1989, annexed as Exhibit 12 to Spett Aff., but failed to remedy the alleged wrong. As all three of the individual defendants were personally involved in the alleged deprivation of plaintiff's rights, all three properly can be sued for damages under § 1983.

### D. *Procedural Due Process*

While plaintiff can proceed against the individual defendants under § 1983, she cannot go forward with her claim that she was deprived of her constitutional right to procedural due process. In analyzing plaintiff's procedural due process claim, the Court undertakes a two-step analysis: (1) did plaintiff assert a constitutionally-recognized property interest, and if so (2) was she deprived of that interest without due process of law. *See Danese v. Knox,* 827 F.Supp. 185, 190 (S.D.N.Y.1993) (citing *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Narumanchi v. Board of Trustees of Connecticut State University,* 850 F.2d 70 (2d Cir.1988)). Plaintiff has failed to demonstrate that she possessed a constitutionally-recognized prop-

erty interest in either the Acting Supervisor or permanent AP position. Therefore, plaintiff has no valid § 1983 claim for deprivation of her right to procedural due process insofar as the claim relates to her involuntary transfer or failure to be hired as AP.

The Supreme Court has explained:

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law ....

*Roth,* 408 U.S. at 577, 92 S.Ct. at 2709.

More recently, the Court has stated that "an at-will government employee ... generally has no [procedural due process] claim based on the Constitution at all." *Waters v. Churchill,* 511 U.S. 661, 679, 114 S.Ct. 1878, 1890, 128 L.Ed.2d 686 (1994); *see also Luck v. Mazzone,* 52 F.3d 475, 477 (2d Cir.1995). This Court finds that plaintiff had no property interest in her Acting Supervisor job because the position was by definition an interim one. *See Huntley v. Community School Board of Brooklyn,* 543 F.2d 979 (2d Cir. 1976) (finding that an Acting Principal has no property interest in continued employment in that position); *see also Perry v. Sindermann,* 408 U.S. 593, 599, 92 S.Ct. 2694, 2698–99, 33 L.Ed.2d 570 (1972) (a lack of formal contractual or tenure security in continued employment as a teacher is "highly relevant" to procedural due process claim). Nor can Murray claim a property interest in a permanent AP position that she never occupied. *See Perry,* 408 U.S. at 603, 92 S.Ct. at 2700 ("a mere subjective expectancy" of employment is not protected by procedural due process). Therefore, the Court must dismiss plaintiff's § 1983 claim for deprivation of her right to procedural due process.

### IV. Section 1981 Claims

Plaintiff can proceed under § 1981 for discrimination in the failure to promote her to AP–Special Education, but the failure to promote claim is the only one she can pursue under § 1981.[13] Section 1981 (recodified as

---

**13.** As explained *supra* 182 n. 12, plaintiff can pursue her § 1981 claims only against the indi-

vidual defendants.

§ 1981(a) following passage of the Civil Rights Act of 1991 ("CRA")) provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens ...." 42 U.S.C. § 1981(a). In *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court restricted the scope of § 1981 by holding that the statute applies to discrimination in contract formation but not contract performance. As Congress disfavored this narrow reading of § 1981, it "overruled" *Patterson* in the CRA and widened the scope of discriminatory action covered by § 1981. *See* 42 U.S.C. § 1981(a), (b). The Second Circuit and (later) the Supreme Court have ruled that amended § 1981 is not to be applied retroactively. *See Butts,* 990 F.2d at 1404; *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 308, 114 S.Ct. 1510, 1517, 128 L.Ed.2d 274 (1994). The CRA took effect on November 21, 1991; the last act of discrimination alleged in the instant case took place in 1990. Therefore, plaintiff's § 1981 claims are governed by *Patterson* rather than by the more liberal standard of the CRA.

In *Patterson,* the Court stated that "Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcing of contracts." 491 U.S. at 176, 109 S.Ct. at 2372. Thus, discrimination in the performance of contracts is not actionable under *Patterson. See Butts,* 990 F.2d at 1411. As plaintiff's wrongful transfer claim involves performance of a contract rather than the making or enforcement thereof, the alleged wrongful transfer is not actionable under § 1981. *See Gilmore v. Local 295,* 798 F.Supp. 1030, 1036 (S.D.N.Y.1992) (stating that under *Patterson,* no cause of action under § 1981 for wrongful termination nor discriminatory application of disciplinary system).

The Supreme Court in *Patterson* specifically addressed the applicability of § 1981 to a "failure to promote" claim:

> [T]he question whether a promotion claim is actionable under § 1981 depends on whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981 .... Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981.

491 U.S. at 185, 109 S.Ct. at 2377.

The only example the Court offered of a "new and distinct relation" was the paradigmatic case of the elevation of an associate in a law firm to partner. *See id.* at 185–86, 109 S.Ct. at 2377–78 (citing *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Fortunately, the Second Circuit has elaborated:

> Promotions understood by the parties to be given routinely upon satisfactory job performance do not give rise to a new employment contract .... However, any promotion that creates a qualitatively different relation between the employer and employee, for example a move from factory worker to foreman, foreman to foreman supervisor, or manager to officer, likely would create a new and distinct relation giving rise to a § 1981 action under *Patterson.* The inquiry should not be confined to titles; it should examine actual changes in responsibility and status.

*Butts,* 990 F.2d at 1412.

Guided by *Butts,* the Court finds that plaintiff's failure to promote claim is actionable under *Patterson.* As noted previously, in deciding this motion for summary judgment the Court must draw all factual inferences in favor of the non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. There exists an issue of fact as to plaintiff's job at the time Reekstin was hired as AP. After the second round of Level II interviews on February 6, 1990, see Def.3(g) at ¶ 24, Chancellor Fernandez selected Reekstin on February 27, 1990. *See* Ex. S to Dean Decl. Plaintiff points to a memo of February 2, 1990, in which Wolff claims to assign her to James Monroe High School as a special

education teacher, as evidence that she was merely a teacher at the time of the promotion decision. There exists at the least a genuine issue of material fact as to this issue. Assuming, as the Court must, that plaintiff was a teacher at the time of the decision to hire Reekstin, a promotion to AP–Special Education would have presented a "new and distinct relation" between employee and employer (along the lines of the promotion from foreman to foreman supervisor mentioned in *Butts*.) Therefore, the Court must deny defendants' motion for summary judgment on plaintiff's § 1981 claim for failure to promote. *See Harris v. New York Times,* 1993 WL 42773 (S.D.N.Y.) (refusing to dismiss § 1981 claim for failure to promote). Plaintiff can proceed against the individual defendants under § 1981 for the allegedly discriminatory failure to promote her to AP–Special Education.

## CONCLUSION

For the reasons set forth in this Opinion, defendants' motion for partial summary judgment is GRANTED in part and DENIED in part.

**SO ORDERED.**